In re MOUNT PLEASANT LIMITED PARTNERSHIP, Debtor-in-Possession.

In re GRAND TRAVERSE DEVELOPMENT COMPANY LIMITED PARTNERSHIP, Grand Traverse Development Company, Inc., and Grand Traverse Condominium Developers, Inc., Debtors-in-Possession.

Bankruptcy Nos. SL91–86763, ST92–83818 to ST92–83820.

United States Bankruptcy Court, W.D. Michigan.

Sept. 1, 1992.

Dickinson, Wright, Moon, VanDusen & Freeman (William D. Tomblin, briefed), Lansing, Mich., for debtor Mount Pleasant Ltd. Partnership.

Glassen, Rhead, McLean, Campbell & Bergamini (Roland F. Rhead, briefed), Lansing, Mich., for Meadowbrook Investment Co.

Miller, Canfield, Paddock & Stone (James G. Vantine, Jr., briefed), Kalamazoo, Mich., for Comerica Bank.

Schafer & Weiner, P.C. (Daniel J. Weiner, argued), Birmingham, Mich., for debtors Grand Traverse Development Co. Ltd. Partnership, Grand Traverse Development Co., Inc., and Grand Traverse Condominium Developers, Inc.

Clark, Klein & Beaumont (Michael S. Khoury, argued), Detroit, Mich., for Board of Trustees of the General Retirement System of the City of Detroit and GRS Grand Hotel Corp.

## CONSOLIDATED OPINION REGARDING ASSIGNMENT OF RENTS

JO ANN C. STEVENSON, Bankruptcy Judge.

### I. INTRODUCTION.

At issue in these two cases are the relative rights of secured creditors and debtors in rents subject to an assignment of rents. Because the outcome of pending motions in these two chapter 11 cases are controlled by similar sets of facts and questions of law, the Court on its own motion consolidates these two matters for the limited purpose of addressing this issue. FED. R.BANKR.P. 7042; FED.R.CIV.P. 42(a).

### II. FACTS.

#### A. *Mount Pleasant Limited Partnership.*

Debtor Mount Pleasant Limited Partnership ("Mount Pleasant") owns and operates a complex of student apartments and condominiums in Mount Pleasant, Michigan, the home of Central Michigan University. It acquired the property from Meadowbrook Investment Company ("Meadowbrook") on February 29, 1984 for $5.1 million. Of the purchase price, $4.5 million was represented by a promissory note secured by a mortgage containing an assignment of rents provision. As permitted in the mortgage, Meadowbrook assigned a portion of that indebtedness to Comerica Bank ("Comerica"). Meadowbrook and Comerica will sometimes be referred to as the "Lenders."

The assignment of rents clause in the mortgage purports to be unconditional. However, under the assignment Mount Pleasant retained the right to collect the rents until certain conditions occurred:

> This assignment of all rents, profits and income under any existing and future lease or leases is absolute and unconditional as of the date hereof; provided, however, so long as there is no default under the terms and provisions of the Notes and Mortgage, Mortgagor is hereby authorized, until such authorization is revoked by Mortgagee upon an event of default hereunder, to collect, receive and retain and dispose of such rents....

Mount Pleasant Mortgage, ¶ 8.

Despite the best efforts of Mount Pleasant's limited partners, revenues plummeted when on-campus enrollment at Central Michigan University declined. By January

29, 1991 Mount Pleasant had defaulted on its mortgage obligations. On that date Meadowbrook's attorney sent a letter to Mount Pleasant's then general partners notifying them of the default. That letter contained the following paragraph:

Please be advised that if the existing delinquent taxes are not paid and the Mortgage indebtedness brought current on or before March 2, 1991, and the 1990 Winter taxes are not paid on or before February 14, 1991, we will declare the indebtedness owed under the Note and Mortgage immediately due and payable, and will enforce our rights of foreclosure under the Mortgage. In addition, we will revoke the Partnership's authorization under Paragraph 8 of the Mortgage to collect and retain rents of the property.

Comerica's Brief, Exhibit 2. The default was not cured. Nevertheless it appears that the threatened revocation of Mount Pleasant's authorization to collect rents did not occur.

A similar letter was sent by Meadowbrook to Mount Pleasant on November 21, 1991. It contained language virtually identical to that just quoted, except that the deadline date was set at December 21, 1991. In particular, one sentence appeared verbatim as it was found in the first letter: "In addition, we will revoke the Partnership's authorization under Paragraph 8 of the Mortgage to collect and retain rents of the property." Comerica's Brief, Exhibit 3. The parties agree that no further collection action was taken on the assignment of rents for on December 20, 1991 Mount Pleasant commenced its chapter 11 proceeding. The matter is now before the Court on Mount Pleasant's motion for interim use of cash collateral and Meadowbrook's motion to prohibit use of rents. For purposes of these matters only the Lenders have stipulated that the value of the real property is substantially less than the secured indebtedness.

### B. *Grand Traverse Resort.*

The Grand Traverse Resort is a landmark in Traverse City. Towering over the East Grand Traverse Bay shoreline, the complex includes 9 restaurants, 80,000 square feet of conference meeting rooms, 22 "Tower Gallery" retail shops, 2 championship golf courses, a high-rise hotel containing 425 rooms, the usual resort complement of swimming pools, racquetball courts, saunas and the like, and a condominium development. Three separate entities own and operate the complex: Debtors Grand Traverse Development Company Limited Partnership, Grand Traverse Development Company, Inc., and Grand Traverse Condominium Developers, Inc. These Debtors will collectively be referred to simply as the "Resort."

In a financial sense this lakeside resort is "under water." The Resort's major secured creditors, the Board of Trustees of the General Retirement System of the City of Detroit ("Retirement System") and its subsidiary, GRS Grand Hotel Corp. ("Hotel Corp."), collectively referred to as "GRS," are owed in the range of $80 million. The Hotel Corp. holds a first position on the resort property superior to that of the Retirement System. Both obligations are also secured by assignments of rents. Although the value of the resort complex has not yet been fixed, no one seriously disputes that its worth does not even approach this figure.

In December of 1991 the Resort's financial woes led to defaults on both the first mortgage, then held by Massachusetts Mutual Life Insurance Company ("Mass Mutual"), and on the second mortgage. Under an agreement with Mass Mutual, the Retirement System was required to purchase the Mass Mutual indebtedness. It did this in early 1992 and commenced foreclosure on the resort property. This led to the filing of chapter 11 by the Resort on April 16, 1992. Both parties immediately began jockeying for position in the bankruptcy court, both with limited success. Frustrated with the limitations of chapter 11, the Retirement System and the Resort thought it best to scrap the bankruptcy proceedings and start over with a state court receivership. At the request of the Resort the bankruptcy proceedings were dismissed, an order being entered on June 3, 1992.

The best laid plans of the Retirement System and the Resort went awry when the state court judge refused to appoint a receiver. Abortive attempts to reach some other negotiated resolution ensued, during the course of which the Retirement System assigned the Mass Mutual debt to Hotel Corp. On June 12, 1992 the two lenders (now "GRS") recorded a notice of default in the terms of the various mortgages with the Grand Traverse County Register of Deeds and served this document along with the relevant mortgage documents[1] upon the 22 Tower Gallery tenants. When the negotiations proved fruitless GRS resumed foreclosure proceedings, causing the Resort, now represented by new counsel, to file a fresh chapter 11 proceeding on July 7, 1992. Among the flurry of pleadings, motions and briefs filed in the new case was GRS's motion to prohibit the Resort from using rents. The parties agree that the hotel room revenues are not "rent" and thus the motion before the Court focuses on rents generated by the Tower Gallery shops.[2]

### III. JURISDICTION.

Jurisdiction exists in these matters under 28 U.S.C. § 1334(b). These are core proceedings under 28 U.S.C. §§ 157(b)(2)(K), (M), and (O). Accordingly, the Court is empowered to issue final orders.

### IV. APPLICABILITY OF STATE LAW.

#### A. *Butner.*

The starting point for any determination of the rights of parties in rents must be *Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). There, the petitioner held a second mortgage acquired in the course of the mortgagor's chapter XI proceedings under the Bankruptcy Act. Sometime later the bankruptcy judge appointed a trustee who escrowed rents derived from the mortgaged property. The debtor's attempts to reorganize failed, culminating in a default on the mortgages. The property was foreclosed upon at which time the petitioner was the highest bidder. The petitioner then sought to have the escrowed rents applied to its deficiency balance based upon a claimed lien on the rents under North Carolina law. The trustee argued that no lien existed and that the deficiency was therefore an unsecured claim. Looking to state law, the Fourth Circuit determined that the petitioner had no right to the rents under state law and was therefore unsecured.

The Supreme Court limited itself to the issue of whether the court below should have applied state law as the majority of circuits had held, or looked to federal equity principles as had a minority of circuits. *Butner* did not undertake to resolve the state law issues but adopted the majority rule that state law must be applied:

> [T]he federal bankruptcy court should take whatever steps are necessary to ensure that the mortgagee is afforded in federal bankruptcy court the same protection he would have under state law if no bankruptcy had ensued. This is the majority view, which we adopt today.

The rule of the Third and Seventh Circuits, at least in some circumstances, affords the mortgagee rights that are not his as a matter of state law. The rule we adopt avoids this inequity because it looks to state law to define the security interest of the mortgagee. At the same time, our decision avoids the opposite inequity of depriving a mortgagee of his

---

1. There was some dispute at hearing whether the mortgage documents were served upon the tenants, based upon the omission of any reference to such documents in the proof of service on the tenants submitted by GRS. Counsel for GRS represented to the court that in fact the mortgage documents were served and that an amended proof of service would be filed.

2. GRS also contends that there are leases between the debtor entities which are also subject to the assignment. The Resort disputes the existence of any enforceable inter-debtor lease obligations. This matter came on for hearing on the legal issues only on August 17, 1992 and this opinion does not attempt to resolve any factual disputes among the parties (which have yet to be heard), such as how much of the rents are common area maintenance charges, and whether certain leases actually existed. The Court does note in passing that the proof of service filed by GRS as to the tenants does not include any of the debtor entities.

state-law security interest when bankruptcy intervenes. For while it is argued that bankruptcy may impair or delay the mortgagee's exercise of his right to foreclosure, and thus his acquisition of a security interest in the rents according to the law of many States, a bankruptcy judge familiar with local practice should be able to avoid this potential loss by sequestering rents or authorizing immediate state-law foreclosures. Even though a federal judge may temporarily delay entry of such an order, the loss of rents to the mortgagee normally should be no greater than if he had been proceeding in a state court: for if there is a reason that persuades a federal judge to delay, presumably the same reason would also persuade a state judge to withhold foreclosure temporarily. *The essential point is that in a properly administered scheme in which the basic federal rule is that state law governs, the primary reason why any holder of a mortgage may fail to collect rent immediately after default must stem from state law.*

*Id.* at 56–57, 99 S.Ct. at 918–19 (emphasis supplied).

Although *Butner* was decided under the Act, it lost no vitality with the enactment of the Bankruptcy Code. The two published bankruptcy court opinions in this state which address this issue both cite *Butner. See In the matter of P.M.G. Properties,* 55 B.R. 864, 866 (Bankr.E.D.Mich.1985); *In re Coventry Commons Associates (Coventry Commons I),* 134 B.R. 606, 607 (Bankr. E.D.Mich.1991), *rev'd,* 143 B.R. 837, (E.D.Mich.1992) (*Coventry Commons II); see also In re Village Properties Ltd.,* 723 F.2d 441, 445–46 (5th Cir.1984); *Midlantic National Bank v. Sourlis,* 141 B.R. 826, 23 B.C.D. 271, 277 fn. 1 (D.N.J.1992).

■ Although many courts have applied *Butner* in the Code context, frequently the citation has been limited to a rote recitation that state law governs, as was the case in *P.M.G.* and *Coventry Commons I.* In doing so the immediacy of the *Butner* result

has sometimes been ignored. *Butner* by its plain language allows a mortgagee to collect the rents of the property immediately upon the default of the mortgagor if the mortgagee has that right under state law, *notwithstanding the bankruptcy of the mortgagor.* The Bankruptcy Code codifies this result by allowing a lien on rents to continue post-petition. 11 U.S.C. § 552(b).

## B. *The Michigan assignment of rents statute.*

■ The relevant statutory language in Michigan is found in Mich.Comp.Laws Ann. §§ 554.231 and 554.232 (West 1988) which provide respectively as follows:

Sec. 1. Hereafter, in or in connection with any mortgage on commercial property other than an apartment with less than 6 apartments or any family residence to secure notes, bonds or other fixed obligations, it shall be lawful to assign the rents, or any portion thereof, under any oral or written leases upon the mortgaged property to the mortgagee, as security in addition to the property described in such mortgage. Such assignment of rents shall be binding upon such assignor only in the event of default in the terms and conditions of said mortgage, and shall operate against and be binding upon the occupiers of the premises from the date of filing by the mortgagee in the office of the register of deeds for the county in which the property is located of a notice of default in the terms and conditions of the mortgage and service of a copy of such notice upon the occupiers of the mortgaged premises.

Sec. 2. The assignment of rents, when so made, shall be a good and valid assignment of the rents under any lease or leases in existence or coming into existence during the period the mortgage is in effect, against the mortgagor or mortgagors or those claiming under or through them from the date of the recording of such mortgage, and shall be binding on the tenant under the lease or leases upon service of a copy of the instrument under which the assignment is made, together with notice of default as required by section 1.

As set forth in the statute, the chronology of events that would lead to complete enforcement of an assignment of rents is as follows:

1. Execution of the assignment of rents.
2. Recording of the assignment of rents.
3. Default under the mortgage.
4. Recording of notice of default.
5. Service of the recorded notice of default and the instrument creating the assignment of rents upon the tenants by the mortgagee ("the service requirement").

## V. P.M.G. AND COVENTRY COMMONS.

The parties in both cases before the Court have argued at great length the two bankruptcy decisions analyzing this issue under Michigan law, *P.M.G.* and *Coventry Commons I*, and Judge Duggan's reversing opinion in *Coventry Commons II*. The two bankruptcy court opinions are in conflict with one another, and this Court concludes that both were half right. Factually the cases were similar in that in both the secured party had completed all steps except the service requirement. Drawing on both cases, the Court adopts an interpretation consistent with Judge Duggan's ruling in *Coventry Commons II*, although Judge Duggan did not address the *United States v. Whiting Pools*, 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983) issue raised in Judge Rhodes' opinion below.

■ The Court finds the analysis of the statutory language in *P.M.G.* to be most accurate. Judge Brody determined that under Michigan law no further action need be taken by the creditor for the assignment to become binding upon the debtor once the debtor defaults. He reached this conclusion based upon both a plain reading of the statute and the directive of the Michigan Supreme Court in *Security Trust v. Sloman*, 252 Mich. 266, 274, 233 N.W. 216 (1930) that the mortgagee "is entitled to the rents upon default and performance of the statutory conditions." Under section 1 of Michigan's statute, giving "binding effect" to the assignment is conditioned only upon default. Therefore, at the point of default the mortgagor becomes obligated as contractually provided in the assignment.

This interpretation of the statute was rejected by Judge Rhodes in *Coventry Commons I*. Relying on *Security Trust* and *Giblin v. Detroit Trust Co.*, 270 Mich. 293, 258 N.W. 635 (1935), Judge Rhodes held that the service requirement was also a statutory condition which must be performed before a mortgagee could obtain a right to present rents. 134 B.R. at 610–11. He described the mortgagee's interest in rents prior to meeting the service requirement as an "inchoate" right to receive rents in the future. 134 B.R. at 609. However, on appeal the district court reversed this ruling, stating that the opinion below read too much into *Security Trust*. The district court opted instead for the interpretation of that case contained in *P.M.G.*

■ The better view of the significance of the service requirement is found in the distinction between "perfection" and "enforcement." The meaning of the term "perfection," unambiguous in other commercial law contexts, has been the source of continuing confusion in this area of the law. Some courts in other jurisdictions have viewed steps similar to the service requirement as necessary to "perfect" the security interest in rents. We reject this definition of perfection in favor of that found in *In re Vienna Park Properties*, 136 B.R. 43, 54 (S.D.N.Y.1992):

> "[P]erfection" refers to the process by which a secured party puts third-parties on notice of its interest, whereas "enforcement" refers to the steps the secured party must take to realize its rights in the collateral, which in this case is the rental income.

As provided in section 2 of the Michigan statute, the assignment of rents becomes valid as to third parties upon its recording with the register of deeds; at this point it is "perfected." The service requirement is therefore not related to *perfection*, but to *enforcement* of the assignment.

A number of courts, like *Coventry Commons I,* have attempted to fashion some distinct label other than "perfection" for the act of completing the service requirement, or its analog under the laws of other states. Thus the terms "choate" and "inchoate" have often appeared to describe the step of enforcing the assignment of rents with respect to the tenants. This practice is problematic because this term is used neither in state law nor in the Bankruptcy Code. However, assuming this classification to be apt, the only time that the mortgagee's interest can be accurately described as "inchoate" under the Michigan statute is prior to default. At that point the assignment might never become enforceable because the mortgage might yet be paid in full according to its terms. Once default occurs, however, the assignment becomes binding, and the mortgagee has a "choate" or present vested right in the rents. As stated in *P.M.G.* at 869–70, the service requirement only determines which party has the initial right to collect the rents, and is intended as a protection for the tenants. It does not affect the rights between mortgagor and mortgagee.

■ However, the right to collect rents is critical in one respect, and it is in this regard that the Court diverges from *P.M.G.* That opinion concluded that rents accruing after default were not property of the estate, and therefore not cash collateral:

> For the reasons stated, it is the conclusion of the court that a mortgagor's interest in rents made subject to an assignment of rents pursuant to the 1953 Michigan Act (M.C.L. §§ 554.231 and 554.232) is automatically terminated upon default by the mortgagor. Therefore, Bonny Brook's [debtor's predecessor in interest] interest in the rents terminated no later than May 6, 1985, when Consolidated served the notice of default upon Bonny Brook. Accordingly, the debtor did not acquire any interest in the rents from the mortgaged property.

This rationale ignores the holding of *Whiting Pools,* and this was the basis in part for Judge Rhodes' divergence from *P.M.G.* in *Coventry Commons I.* Judge Rhodes correctly noted that the debtor-in-possession has the ability to avoid the transfer of rents to the creditor under *Whiting Pools,* when the service requirement has not been met.[3] Under 11 U.S.C. § 542(a) the debtor-in-possession may compel a party to turn over property it holds which the debtor-in-possession may use under 11 U.S.C. § 363. Subject to certain restrictions, that section provides that the debtor may use "property of the estate." Under 11 U.S.C. § 541(a)(1), "property of the estate" encompasses all legal and equitable interests of the debtor. As long as the recording of the notice of default and service steps have not been taken, as was the case in both *P.M.G.* and *Coventry Commons,* the debtor has at least the bald legal right to collect the rent. Under *Whiting Pools* the rents may be used as long as there is adequate protection of the creditor's interest if the debtor holds a legal right to collect the rent.

But where the notice and service procedure has been completed, the debtor has lost the legal right to collect the rents. Therefore, the rents cease to be property of the estate. Two conclusions follow: first, there is no *Whiting Pools* problem because that decision applies only to property of the estate; and second, because the rents are not property of the estate, they are not cash collateral which is a form of property of the estate.

■ The foregoing analysis applies where the assignment of rents gives the mortgagee rights equal or greater than those circumscribed in the statute. Because the statute was enacted to ameliorate the common law bar on enforcement of such assignments, *see P.M.G.* at 867–68, the Court views the statute as stating the limit, or fullest extension, of a mortgagee's rights. On the other hand, there is no contravening restriction in the statute on affording a mortgagor greater protections.

**3.** Judge Rhodes suggested that the debtor might have this ability even where the service requirement has been met. This Court respectfully disagrees, for reasons more fully discussed in the context of the Grand Traverse Resort case below.

In this regard basic contract principles apply. As stated in *Massachusetts Mut. Life Ins. Co. v. Sutton*, 278 Mich. 457, 461–462, 270 N.W. 748 (1936):

> [W]here a subsequent specific contract is made for possession or rents, it will be enforced according to its terms.... The contract for possession or rents must be read with the settled policy of the State in mind and the mortgagor should not be deprived of them except in a case where the right is clearly given the mortgagee by the engagement of the parties.

## VI. APPLICATION IN THE MOUNT PLEASANT CASE.

This case presents three issues under Michigan law: first, what effect does the variance of the contract language with the provisions for assignments of rent contained in Michigan law have in the context of the progression set forth above; second, how far had Meadowbrook and Comerica progressed toward execution on the rents as of the date of filing; and third, what rights do the parties have in the rents accruing post-petition? We address these *seriatim*.

### A. *Interpretation of the mortgage document.*

The Mount Pleasant mortgage purports to create an immediate and absolute assignment of rents. Because this assignment is contained in a mortgage, it is governed by the statute under discussion and therefore has no binding effect until Mount Pleasant defaults. However, the provision does not provide that the mortgagee immediately becomes entitled to the rents upon default, but instead states that the mortgagor "is hereby authorized, *until such authorization is revoked by Mortgagee* ... to collect, receive and retain and dispose of such rents." This language plainly states that an additional affirmative act after default must be taken by the Mortgagee in order to divest Mount Pleasant of its ownership of the rents. This is a permissible restriction under *Massachusetts Mutual*. Accordingly, this act, revocation of authority, is required not by the statute but is required by the negotiated agreement of the parties.

### B. *Lenders' progress toward enforcement of the assignment.*

While enforcement is normally automatic, that is, the assignment becomes binding upon default without further action, in this case enforcement required the second step of revocation of authority pursuant to ¶ 8 of the mortgage. The Court determines that such a revocation never occurred pre-petition. Although Meadowbrook threatened this action twice, it did not take the necessary affirmative step the first time, and was thwarted by the filing of the chapter 11 from doing so the second.

### C. *Rights in post-petition rents.*

Having concluded that the rents were Mount Pleasant's property at the time of filing does not resolve this case, for the lien upon these rents continues post-petition. 11 U.S.C. § 552(b). The Court finds that *Vienna Park, supra,* is most dispositive of this issue. There the debtor had defaulted on the notes secured by the assignments of rents in question pre-petition but the creditor had no opportunity to move to enforce the assignments before the debtor filed chapter 11. The bankruptcy court initially determined that the rents were cash collateral, concluding that the assignment of rents was absolute under the applicable law of Virginia. Six months later it reversed itself *sua sponte* and in a second opinion concluded that the assignments were for security, and that under Virginia law possession was necessary for a lienor to "perfect" its lien interest.

This holding was reversed by the district court. The court concluded that, contrary to the bankruptcy court's finding, the assignments of rents, whether absolute or for security, were perfected upon recording. The court then turned to *Butner*, interpreting it to require some affirmative act by the creditors post-petition to emulate the state law steps to take possession required before they could realize on their lien. This emulation was required in order to resolve the tension between the automatic

stay and § 552(b): the creditor is stayed from taking steps to realize upon its assignment because it secures a pre-petition debt, and yet it holds a post-petition interest in a revenue stream which continues to flow post-petition. The court implemented its holding by adopting a position espoused by neither party:

> [W]e reject the contention that the Secured Creditors should be forced to demonstrate their entitlement to relief from the automatic stay, which requires a showing that their security interest is inadequately protected or that the debtor has no equity in the rents and the rents are not necessary to an effective reorganization. Section 362(d). These requirements impose a burden on the Secured Creditors that they would not suffer under Virginia law in the absence of bankruptcy. That result is contrary to *Butner*, and we reject it.
>
> At the same time, the Secured Creditors ask that in the event that we determine that the rents are cash collateral, as we have done, we find them entitled to the proceeds from the date of the Debtor's default. Had the bankruptcy not ensued, of course, the Secured Creditors would have been required under Virginia law to obtain possession of the property before collecting the rents. Because the automatic stay prevented those enforcement steps, we hold that the Secured Creditor's [sic] Motion for Sequestration served as an appropriate "enforcement surrogate," and that the Secured Creditors are entitled to the rents from the date they filed that motion.

136 B.R. at 55. The language of the first paragraph is directly applicable to the argument advanced in *In re Harbour Town Associates, Ltd.* 99 B.R. 823 (Bankr. M.D.Tenn.1989), a case relied upon by Mount Pleasant. The *Harbour Town* court found that the mortgagee had not taken all steps necessary to be entitled to collect the rents under state law prior to filing. It characterized these steps as being necessary to "perfect" the mortgagee's interest. *Id.* at 825. The court held that those steps could not be taken post-petition without first lifting the stay.

This holding conflicts directly with *Butner's* directive that a bankruptcy court should take steps necessary to see that a mortgagee's exercise of rights as to rents is impeded no more than it would be under state law. The *Harbour Town* opinion thus glosses over the inherent tension between the automatic stay of § 362 and the post-petition enforceability of a security interest in rents under § 552(b). To require a creditor to obtain relief from stay in order to assert a perfected post-petition interest in rents effectively eviscerates § 552(b).

The *Harbour Town* court also held that because the mortgagee had not perfected, its interest in the rents was avoidable by a hypothetical judicial lien creditor under § 544, and therefore the debtor could avoid the assignment entirely. While it is conceivable that this was the result under state law in Tennessee, in Michigan the statute clearly mandates a different result. Section 2 of the statute unambiguously states that once the assignment is recorded it has priority against any other claimant:

> The assignment of rents, when so made, shall be a good and valid assignment of the rents under any lease or leases in existence or coming into existence during the period the mortgage is in effect, against the mortgagor or mortgagors or those claiming under or through them from the date of the recording of such mortgage....

MICH.COMP.LAWS ANN. § 554.232 (West 1988). This Court finds the conventional definition of "perfection" employed in *Vienna Park* to be more in keeping with Michigan law.

This Court further finds *Vienna Park's* solution to be applicable to the controversy now before it. Meadowbrook and Comerica share a perfected security interest in the Mount Pleasant's rents. Under § 552(b) that security interest continues post-petition. The only necessary step that was not taken pre-petition in order to bind Mount Pleasant was simply writing a letter revoking Mount Pleasant's authorization to

collect rents, putting it in an envelope, and mailing it to Mount Pleasant by certified or registered mail with postage prepaid, return receipt requested. *See* Mortgage, ¶ 21. With the advent of bankruptcy such a notice was prohibited by the automatic stay. The filing by Meadowbrook of a motion to prohibit use of the rents, however, served the same function. The Court finds that the service requirement under ¶ 21 of the mortgage was superseded by FED.R.BANKR.P. 9014 and 7004. Accordingly, all rent payments made after the filing of the motion to prohibit use of rents by Meadowbrook constitute the cash collateral of Meadowbrook and may not be used by Mount Pleasant in the absence of adequate protection of Meadowbrook's interests. 11 U.S.C. §§ 363(c), (e).

■ Adequate protection may here pose a problem for Mount Pleasant. The debtor is obligated to pay adequate protection for each rent payment it receives. Where the creditor is undersecured it is probable that the only way the secured creditor may be adequately protected is by dollar for dollar payments (less any properly chargeable costs under § 506(c)) because post-petition rents will also be subject to the assignment. Therefore current rents cannot be used to provide adequate protection for previous payments because the mere act of doing so would make it impossible to provide adequate protection for current payments. This should hold true in every case unless the creditor is oversecured, or is in some other way assured of receiving either recovery of the full mortgage balance or surrender of the property.

### VII. APPLICATION IN THE RESORT CASE.

■ The feature distinguishing the Resort case from the Mount Pleasant case is that GRS completed the service requirement. Based upon our interpretation of the statute, the Court is constrained to hold that once the service requirement was met, the Resort lost any interest in the rents under state law. The Resort raises two challenges to this result in the bankruptcy setting, both rooted in *Whiting Pools.*

■ The Resort adopts an argument in *Coventry Commons I* that because *P.M.G.* states, "It is assumed ... that [the lender] will apply the rent to preserve the mortgaged premises and to reduce the mortgage debt," 55 B.R. at 870, the Resort did retain some interest in the rents and that *Whiting Pools* is therefore applicable even after the service requirement has been met. The Court disagrees with this interpretation. The interest to which the *P.M.G.* court alludes in this statement is nothing more than the right any debtor has to see that payments made or collateral liquidated are applied to the indebtedness. While the mortgagee is under a duty to use the rents to preserve its collateral and may be required to make expenditures to that end, the debtor has no interest in the actual payments made or the collateral liquidated. The debtor's right is analogous to the right of a debtor whose vehicle was repossessed and sold to have the sale proceeds applied to her loan. This right does not give her the right to demand that the bank return her car. The only distinction is that in the case of an assignment of rents the collateral executed upon and liquidated is an income stream rather than a physical object.

■ The Resort also asserts that it has an equity interest in the rents because if the mortgage is satisfied, the right to collect rents will revest in the Resort. This equitable interest, however, is in future rents, not present rents where the mortgage is in default. To illustrate, assume that a mortgagor outside of bankruptcy defaults on his mortgage, but is able to obtain new financing and redeems the original mortgage. Further assume that during the period between the default and satisfaction the rents were collected by the mortgagee. Under this scenario, the rents collected by the mortgagee would remain the mortgagee's property. The mortgagor derives a benefit from the payments only to the extent that they are used to reduce his indebtedness. But the rents accruing after redemption would be the debtor's property because there no longer is any indebtedness for them to secure.

As the illustration demonstrates, once default occurs a role reversal of sorts takes place. The mortgagor now has an "inchoate" right to future rents, based on the uncertain possibility that the property will be redeemed and the default will be cured, much like the mortgagee had an "inchoate" interest in rents prior to default. The interest which the mortgagor has does not entitle him to payment of current rents even if he realizes on his inchoate right of redemption. These rents have slipped forever from his grasp, and bankruptcy cannot change this fact. To interpret *Whiting Pools* so broadly as to *never* permit the debtor's rights in rents to terminate would effectively overrule *Butner;* no matter what state law provided, a mortgagor could never become entitled to receive rent payments once bankruptcy intervened. Given the fact that *Butner* was favorably cited by the Supreme Court in *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988)[4], which was decided after *Whiting Pools,* the Court concludes that the Supreme Court did not intend this result.

## VIII.  CONCLUSION.

In the end, the Court must return to *Butner's* mandate that "the primary reason why any holder of a mortgage may fail to collect rent immediately after default must stem from state law." These state law consequences inexorably must survive the filing of bankruptcy: under Michigan law the debtor's obligation to surrender rents is automatically activated upon default under the mortgage; and the right to collect rents passes from mortgagor to mortgagee upon satisfaction of the service requirement. The right to collect the rent does empower the debtor to use the rent subject to the conditions set forth in § 363(e). But retaining that right may be

a pyrrhic victory for the debtor given § 552(b) which makes every post-petition rent payment subject to the assignment of rents. Such that it is, that victory belongs to Mount Pleasant but not to the Resort.

---

**4.** The relevant passage from *Timbers* is set forth below:

Section 552(b) sets forth an exception, allowing post-petition "proceeds, product, offspring, rents, or profits" of the collateral to be covered only if the security agreement expressly provides for an interest in such property, and the interest has been perfected under "applicable nonbankruptcy law." *See, e.g., In re Casbeer,* 793 F.2d 1436, 1442–1444 (CA5 1986); *In re Johnson,* 62 B.R. 24, 28–30 (CA9 Bkrtcy.App. Panel 1986); cf. *Butner v. United States,* 440 U.S. 48, 54–56, 99 S.Ct. 914, 917–18, 59 L.Ed.2d 136 (1979) (same rule under former Bankruptcy Act).

484 U.S. at 374, 108 S.Ct. at 632.