**In re ONE TIMES SQUARE ASSOCIATES LIMITED PARTNERSHIP, Debtor.**

**Bankruptcy No. 92 B 41471 (CB).**

United States Bankruptcy Court, S.D. New York.

Oct. 15, 1993.

Shaw, Licitra, Parente, Esernio & Schwartz, P.C., Garden City, NY By J. Stanley Shaw, Craig A. Damast and Barbara L. Weisberg, for debtor.

LeBoeuf, Lamb, Leiby & MacRae, New York, NY By John S. Kinzey, John P. Campo, Ira A. Reid and Timothy W. Walsh, for Banque Nationale de Paris.

### MEMORANDUM OF DECISION ON CONFIRMATION OF THE DEBTOR'S PLAN OF REORGANIZATION

CORNELIUS BLACKSHEAR, Bankruptcy Judge.

#### INTRODUCTION

The matter before this Court is confirmation of the Plan of Reorganization (the "Plan"), filed by One Times Square Limited Partnership (the "Debtor") in the One Times Square Limited Partnership Chapter 11 Case. As is more fully explained below, Banque Arabe et Internationale d'Investissement [1] (the "Bank") has filed four primary objections to confirmation of the Plan.

First, the Bank argues that the Plan improperly classifies claims for the sole purpose of manipulating the voting, to ensure at least one impaired class accepts the Plan. The Bank asserts that the separate classification of unsecured claims into Classes 5 and 6 is improper and violates sections 1122(a) and 1129(a)(1) of the Bankruptcy Code (the "Code") [2].

The Bank's second objection is that the Plan fails to provide the Bank with "fair and equitable" treatment with respect to its secured claim, because the Plan does not provide the Bank with a present value on its secured claim, equal to or greater

---

1. On March 30, 1993, Banque Nationale de Paris, by assignment, became successor in interest to Banque Arabe et Internationale d'Investissement's interest in the note and mortgage on Debtor's building and real property located at One Times Square.

2. Section 1122 of the Code provides:
 (a) except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests.
 (b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.
 Section 1129(a)(1) provides:
 The court shall confirm a plan only if ...
 The plan complies with the applicable provisions of this title.

than the $19,000,000 stipulated value. Thus, the Plan violates section 1129(b)(2)(A)(i)(II) of the Code[3].

The Bank's third objection is that the Plan violates the absolute priority rule, as codified in section 1129(b)(2)(B)(ii) of the Code[4] because it does not provide the Bank with fair and equitable treatment with respect to its unsecured claim. The Bank argues it would not be paid the full present value of its claim while the junior Class 8 claimants are permitted to retain their prepetition interests. Lastly, the Bank maintains that the Plan is not feasible as required by section 1129(a)(11) of the Code[5].

For the following reasons this Court holds that the Debtor's Plan cannot be confirmed.[6]

## BACKGROUND

On October 17, 1991, the Bank began foreclosure proceedings against the Debtor in New York State Supreme Court. The Debtor's single asset is the building and real property located at One Times Square ("OTS"), New York City. OTS is encumbered by the Bank's mortgage and security interest in all rents, profits, proceeds and contractual rights arising out of OTS, as set forth in the Agreement of Spreader, Consolidation and Modification of Mortgage and the Amended and Consolidated Mortgage Note executed between the Bank and the Debtor on March 14, 1989.

On March 11, 1992, the Debtor filed its Chapter 11 petition. As of the petition date, the Debtor owed the Bank $30,045,-311.18.

On April 28, 1992, the Debtor moved this Court, by separate motions, for authorization to reject certain executory contracts (the "signage agreements" or "contracts") between the Debtor and Spectacolor, Inc. ("Spectacolor"), and the Debtor and Van Wagner Communications, Inc. ("Van Wagner"). Spectacolor and Van Wagner are sign management companies, licensed to sell advertisements on the facades of OTS. The Debtor's rejection of the current Van Wagner and Spectacolor agreements would result in damage claims totalling $3,000,-000.

On June 8, 1992, the Debtor and the Bank entered into a stipulation fixing the value of OTS. The parties agreed that for purposes of section 506(a) of the Bankruptcy Code (the "Code"), the value of OTS, as of the filing date, was $19,000,000. The Bank did not move before this Court for treatment of its entire claim as secured, pursuant to section 1111(b)(2) of the Code[7]. Therefore, the Bank has a secured claim of

---

**3.** Section 1129(b)(2) defines "fair and equitable" in relation to the treatment of claims in a chapter 11 reorganization plan. Pursuant to section 1129(b)(2)(A)(i)(II), a plan is fair and equitable: with respect to a class of secured claims, [if, *inter alia*,] the plan provides—
that each holder of a claim of such class receive on account of such claim deferred cash payments totalling at least the amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property.

**4.** The absolute priority rule, as codified in sections 1129(b)(2)(B)(i) and (ii), provides:
With respect to a class of unsecured claims—
the plan provides that each holder of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

**5.** Section 1129(a)(11) of the Code provides:

"The Court shall confirm a plan only if ... Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."

**6.** This court's subject matter jurisdiction over this matter arises under 28 U.S.C. §§ 1334(b) and 157(a) and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.).

**7.** Section 1111(b)(2) of the Code provides:

If such an election is made, then notwithstanding section 506(a) of this title, such claim is a secured claim to the extent such claim is allowed.

$19,000,000 and an unsecured deficiency claim of approximately $11,050,000.

On July 15, 1992, the Debtor filed its Disclosure Statement and Plan of Reorganization. The Disclosure Statement was approved by order of this Court dated September 30, 1992.

On July 17, 1992, the Debtor and the Bank entered a stipulation approved by this Court which, *inter alia*, modified the automatic stay only so far as to permit the Bank to continue foreclosure proceedings in New York State Supreme Court to judgment. The stipulation required, however, that if the Bank sought relief from the stay pursuant to section 362(d) of the Code in order to sell any property, it would have to return to the Bankruptcy Court. The Bank continued the foreclosure proceedings and on August 6, 1992, the New York State Supreme Court granted summary judgment of foreclosure in favor of the Bank against the Debtor and Spectacolor. On August 20, 1992, the New York State Supreme Court also granted summary judgment of foreclosure in favor of the Bank against the Debtor and Van Wagner. On January 8, 1993, the New York State Supreme Court granted a judgment of foreclosure and sale in favor of the Bank. The judgment was entered on April 7, 1993. The Bank now seeks relief from the automatic stay pursuant to section 362(d) in order to proceed with a foreclosure sale.

On November 9, 1992, the Debtor executed separate stipulations with Spectacolor and Van Wagner (the "November 9 Stipulations"). The parties agreed that the signage agreements between the Debtor and each party would be deemed rejected contingent upon, *inter alia*, this Court's approval and confirmation of the Debtor's Plan of Reorganization pursuant to section 1129(b) of the Code. The Van Wagner stipulation, *inter alia*, obligated Van Wagner to contribute up to $720,000 to the Debtor, for the Debtor's use in funding the Plan.

Contemporaneously, the Debtor negotiated new signage agreements with Spectaco-

lor and Van Wagner which, unlike the existing agreements between the parties, provide the Debtor with a greater percentage of the income generated from the signage. The November 9 Stipulations expressly conditioned approval of the new signage agreements upon a vote by Van Wagner and Spectacolor in favor of the Plan. The approval of the November 9 Stipulations is pending before this Court.

The Plan contemplates eight classes of creditors. They are:

Class 1, which includes all administrative priority claims. The Debtor estimates these claims will total approximately $300,000 as of the effective date of the Plan;

Class 2, which includes priority claims other than administrative or tax claims (there are no claims in this class);

Class 3, which includes all priority tax claims (there are no claims in this class);

Class 4, which includes the Bank's allowed secured claim of $19,000,000;

Class 5, which includes the allowed unsecured claims of Spectacolor and Van Wagner, which arise from the Debtor's anticipated rejection of the existing executory contracts, totalling approximately $3,000,000;

Class 6, which includes general unsecured claims, aggregating approximately $11,250,000. This class consists of the Bank's deficiency claim of approximately $11,050,000 and the claims of the small trade vendors which aggregate approximately $202,860;

Class 7, which includes the allowed claims of certain principals of the Debtor for commissions from the sale of new signage on OTS; and

Class 8, which includes the interests of the limited partners of OTS.

Under the proposed Plan, the claims in Classes 1, 2, and 3 will be paid in full pursuant to section 1129(a)(9)(A) of the

Code [8], on or before the effective date of the Plan and are, therefore, unimpaired.

Under the proposed Plan, the Debtor will pay the Bank's Class 4 allowed, secured claim of $19,000,000 with deferred cash payments over a ten (10) year period, based upon a thirty (30) year amortization rate, with a balloon payment at the end of the tenth year. The Debtor proposes to make monthly payments of principal and interest at either a fixed LIBOR [9] rate plus 4%, or a floating LIBOR rate plus 1.75%, equalling, approximately, $1,517,000 annually, or $15,169,000 over the life of the Plan. Further, the Debtor anticipates making additional principal payments of $3,870,000 during the life of the Plan, and that the final balloon payment would equal, approximately, $11,841,000. Thus, the Plan proposes that the payments to the Bank will total, approximately, $30,880,000.

Van Wagner and Spectacolor, the Class 5 claimants, are to be paid 2.50% of the amounts of their claims equalling $75,000, without interest, in 11 equal installments. The first payment is to be made from a cash contribution, by the Debtor to the estate, on the effective date of the Plan. The ten (10) subsequent installments are to be made on a yearly basis.

The Plan proposes to pay the Class 6 claimants 7.50% of their allowed claims, without interest, over a five (5) year period in equal installments. The first payment is to be made from a cash contribution, by the Debtor to the estate, on the effective date of the Plan. The five (5) subsequent payments are to be made on a yearly basis. Therefore, the Bank will be paid $828,398.18 on its deficiency claim, and the small trade vendors will receive $15,220.50.

The Class 7 claims will not, by consent of their holders, be paid under the Plan.

The Class 8 claimants, the Debtor's limited partners, will retain their interests in the Debtor, in consideration for their cash contributions to the Plan. Their contributions include $1,590,000 in cash on or before the effective date, $240,000 of which is to be received by the Debtor from Van Wagner, pursuant to the Van Wagner stipulation. An additional $807,000 will be contributed by the limited partners, $480,000 of which will be received by the Debtor from Van Wagner, if needed, pursuant to the Van Wagner stipulation, on the first and second anniversaries of the effective date of the Plan. The total, potential contribution by the limited partners would equal approximately $2,397,000.

The impaired classes entitled to vote on the Plan are Classes 4, 5, and 6. Classes 4 and 6 voted to reject the Plan, pursuant to Bankruptcy Rule 3018(d) [10]. Class 5 voted in favor of the Plan. Therefore, the Debtor is seeking confirmation of the Plan pursuant to section 1129(b) of the Code or what is referred to in the vernacular as "cram down" [11].

## DISCUSSION

There is a philosophy of strict statutory construction which indicates that judges should give deference to the plain meaning of a statute. In other words, the judge

**8.** Section 1129(a)(9)(A) provides:

> The court shall confirm a plan ...
> Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, [if] the plan provides that—
> with respect to a claim of the kind specified in section 507(a)(1) or 507(a)(2) of this title, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim.

**9.** The London Interbank Offered Rate ("LIBOR") is the rate paid in London on three-month dollar deposits from other banks, used as a base rate in international lending. New York Times, 7/6/93, section d; p. 7; Col. 2, Table.

**10.** Rule 3018(d) of the Federal Rules of Bankruptcy Procedure provides:

> A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim shall be entitled to accept or reject a plan in both capacities.

**11.** Section 1129(b)(1) of the Code provides:

> ... If all of the requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

should not engage in judicial legislation. This Court adheres to that philosophy and will continue to do so in the future. However, this does not mean that a judge should become an automaton who can be easily replaced, at a reduced cost, by installing a computer on the bench. If Congress had intended such a result, they would not have enacted 11 U.S.C. 105 [12]. Nor would they have inserted language throughout the Code such as "including" or "as the court for cause may order".

■ Congress enacted 11 U.S.C. 105 because they knew that they could not envision all matters dealing with a bankruptcy court or the creativity of attorneys. However, this Court is of the opinion that 11 U.S.C. 105 should be used sparingly and then only to supplement the Bankruptcy Code, not supplant the Code.

## 1) *CLASSIFICATION OF CLAIMS*

■ As a preliminary matter, this Court determines that the November 9, 1993 stipulations between the Debtor and Spectacolor and the Debtor and Van Wagner are hereby approved.[13] By approval of the foregoing stipulations, the former signage agreements are rejected, thereby creating the class of unsecured claims. The Plan proposes to classify the Van Wagner and Spectacolor claims together, separate from the other unsecured claims, and to pay 2.50% of the amount of these claims, without interest, over the life of the Plan. The Debtor has, in effect, created an unsecured, impaired, voting class [14] in order to confirm the Plan.

Bearing the preceding in mind, we will turn to the "unique" issues concerning the classification of claims, within this Chapter 11 Plan of Reorganization. Section 1129(a)(1) provides that a Chapter 11 Plan of Reorganization will be confirmed only if the plan complies with all of the applicable sections of the Code. Section 1123(a)(1) provides that the plan must "designate, subject to section 1122 of this title, classes of claims other than claims of a kind specified in sections 507(a)(1), 507(a)(2), or 507(a)(7) of this title, and classes of interest."

In most single-asset real estate reorganizations the classification dispute concerns the classification of a creditor's deficiency claim apart from the other general unsecured claims. *See e.g., In re 104 Limited,* 160 B.R. 202 (Bankr.S.D.Fla.1993); *In re D & W Realty Corporation,* 156 B.R. 140 (Bankr.S.D.N.Y.1993); *In re 500 Fifth Ave. Associates,* 148 B.R. 1010 (Bankr.S.D.N.Y. 1993), *aff'd,* No. Civ. 844, 1993 WL 316183 (May 21, 1993) (Freeh, U.S.D.J.) (*In re 500 Fifth Ave.*). Here, the Plan classifies the Bank's deficiency claim with most of the other unsecured claims. The issue, therefore, is whether the classification of the Van Wagner and Spectacolor claims separately from the other unsecured claims is permissible.

The Bank claims that the separate classification of most unsecured claims, including the Bank's deficiency claim, into Class 6, and the unsecured signage rejection claims into Class 5, is improper and violates section 1122(a) the Code. The classification scheme, so argues the Bank, serves only to manipulate voting on the Plan to ensure that at least one class votes in favor of the Plan as required by section 1129(a)(10).

**12.** § 105(a) of the Bankruptcy Code provides that:

the court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, *sua sponte,* taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

"The basic purpose of section 105 is to assure the bankruptcy courts power to take whatever action is appropriate or necessary in aid of the exercise of jurisdiction." 2 *Collier on Bankruptcy,* ¶ 105.01 (15th ed. 1990).

**13.** For purposes of these matters, the November 9, 1992, Stipulations referred to herein will be deemed signed as of the date of this opinion.

**14.** It should be noted that unless the Debtor rejects the current signage contracts, the interests of Van Wagner and Spectacolor will be expunged due to the foreclosure judgments against them. *See, supra* at 698, 699.

Thus confirmation of the Plan would allow the Debtor to cram down the Plan over the Bank's dissenting vote.

 Generally, unsecured creditors are claimants of equal rank, entitled to share, *pro rata,* in the values remaining after the payment of secured and priority claims. *In re 266 Washington Associates,* 141 B.R. 275, 282 (Bankr.E.D.N.Y.1992), *aff'd, 266 Washington Associates v. Citibank,* 147 B.R. 827 (E.D.N.Y.1992). Unsecured creditors will ordinarily comprise one class, whether trade, tort, publicly held debt or a deficiency of a secured creditor. *In re Pine Lake Village Apartment Co.,* 19 B.R. 819, 830 (Bankr.S.D.N.Y.1982) (*Quoting, 3 Norton Bankr.L. & Prac.,* § 60.05), *reh'g denied,* 21 B.R. 478 (Bankr. S.D.N.Y.1982).

 A broad reading of section 1122(a) does not, however, require all similarly situated claims to be classified together. The statute on its face merely requires that claims classified together be "substantially similar". 11 U.S.C. § 1122(a). Thus, a debtor is allowed some discretion when classifying unsecured claims. *In re Bryson Properties, XVIII,* 961 F.2d 496, 502 (4th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 191, 121 L.Ed.2d 134 (1992) (*"In re Bryson"*); *In re Greystone III Joint Venture,* 995 F.2d 1274, 1278 (5th Cir.1991) (*"In re Greystone"*); *In re 500 Fifth Ave.,* 148 B.R. at 1018; *cf., In re Mastercraft Record Plating, Inc.,* 32 B.R. 106, 108 (Bankr.S.D.N.Y.1983), *rev'd on other grounds,* 39 B.R. 654 (S.D.N.Y.1984).

 Bankruptcy courts and courts of appeal that have reached the issue, generally hold to one maxim: "Thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan ... Classification of 'substantially similar' claims in different classes ... may only be undertaken for reasons independent of the debtor's motivation to secure the vote of an impaired, assenting class of claims." *In re Greystone,* 995 F.2d at 1279; *In re U.S. Truck Co.,* 800 F.2d 581 (6th Cir.1986); *In re 500 Fifth Ave.,* 148 B.R. at 1019 (Bankr.

S.D.N.Y.1993). The separate classification of substantially similar unsecured claims, therefore, will be allowed only when there is a reasonable basis for doing so or, in other words, when the decision to separately classify does not offend one's sensibility of due process and fair play. *John Hancock Mutual Life Insurance Company v. Route 37 Business Park Associates,* 987 F.2d 154, 158 (3rd Cir.1993); *In re Jersey City Medical Center,* 817 F.2d 1055, 1060 (3d Cir.1987); *Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co. (In re U.S. Truck Co.),* 800 F.2d 581, 586 (6th Cir.1986); *In re Drexel Burnham Lambert Group Inc.,* 138 B.R. 723, 757 (Bankr.S.D.N.Y.1992).

The Debtor contends that the separate classification of the Van Wagner and Spectacolor claims is permissible due to the uniqueness of the claims, interests, and objectives of Van Wagner and Spectacolor, as compared to ordinary general unsecured creditors. The Debtor claims that the classifications were made independent of any motivation to gerrymander an impaired assenting class.

 The Debtor errs, however, in its interpretation of when an unsecured claim may permissibly occupy a class separate from other unsecured claims. Generally, claims resulting from the rejection of executory contracts are legally similar to general unsecured claims. *See, 5 Collier on Bankruptcy* ¶ 1122.03[4], at 1122–11 (Lawrence P. King et al., eds., 15th ed. 1993). It therefore follows that claims can be classified separately only "for 'reasons independent of the debtor's motivation to secure the vote of an impaired assenting class of claims.'" *In re Lumber Exchange Bldg. Ltd. Partnership,* 968 F.2d 647, 649 (8th Cir.1992) (quoting *In re Greystone,* 948 F.2d 134, 139 (5th Cir.1991). However, the uniqueness of the underlying legal nature of a creditor's claim as it relates to the assets of a debtor is an independent reason for which a court may permit separate classification. *In re AOV Industries, Inc.,* 792 F.2d 1140, 1150–1151 (D.C.Cir.1986).

For instance, *In re U.S. Truck Co.,* the Sixth Circuit Court of Appeals affirmed the

District Court's finding that the separate classification scheme proposed by the debtor, U.S. Truck Co., an interstate trucking firm, was proper. Specifically, the Court of Appeals held that the claim of the Teamsters National Freight Industry Negotiating Committee (the "Teamsters Committee") was unique because the union has a "noncreditor interest"—it might vote based on the plan's effect on "its members in the ongoing employment relationship" rather than on the plan's treatment of it as a creditor. *In re U.S. Truck Co.*, 800 F.2d 581, 587 (6th Cir.1986). In addition, the Sixth Circuit affirmed the District Court's findings that the Debtor's separate classification scheme was proper because (1) the employees represented by the Teamsters Committee have a unique continued interest in the ongoing business of the debtor (2) the mechanics of the Teamsters Committee's claim differ substantially from those of the other class which also contained claims arising from the rejection of executory contracts; and (3) the Teamsters Committee's claim is likely to become part of the agenda of future collective bargaining sessions between the union and the reorganized company. *Id.* at 584. Finally, the Court of Appeals found that permitting separate classification of the Committee's claim did not automatically result in adoption of the Plan. *Id.* at 587.

Unlike the Committee in *In re U.S. Truck Co.*, the Debtor has provided no probative basis for separately classifying the Van Wagner and Spectacolor claims, other than to create an impaired class for voting purposes. Here, the claims of Van Wagner and Spectacolor result from the proposed rejection of the current signage agreements and are therefore properly characterized as general unsecured creditors. However, neither the nature of this creditor's business, the nature of the debtor's assets or the mechanics of the creditor's claim sufficiently justifies separate classification. *In re UNR Industries, Inc.*, 143 B.R. 506 (Bankr.N.D.Ill.1992); *In re 266 Washington Associates*, 141 B.R. at 286. Additionally, the interests are neither unique nor greater than any other unsecured creditor in Class 6. The fact that

Van Wagner and Spectacolor are willing to enter into another signage contract with the Debtor if the Plan were to be confirmed further belies the uniqueness of their unsecured claim.

At trial, during cross examination by the Bank's counsel, Arthur Nevid, property manager for the Debtor, admitted that the Debtor separately classified Class 5 claims in order to gerrymander the vote but provided no reasonable basis for having done so:

> Question: You participated in the formulation of the Debtor's plan, right?
>
> Mr. Nevid: Correct.
>
> Question: You are familiar with the plan?
>
> Mr. Nevid: Yes.
>
> Question: Am I correct that the plan contemplates separate classification of the signage rejection claims, is that correct?
>
> Mr. Nevid: Yes.
>
> Question: And the other unsecureds?
>
> Mr. Nevid: Yes.
>
> Question: Can you tell us why that's the case?
>
> Mr. Nevid: We were advised by counsel that we were able to reject those contracts, rejecting those contracts would create them as creditors and that would enhance—that would enable us to have a plan that would be confirmable.

*Hrg.Tr.* at 394 1. 1.20—396 1. 1.16.

Neither the testimony at trial, nor the documents submitted, convince this Court that the rejection of the Van Wagner and Spectacolor contracts, and their separate classification into Class 5, is necessary to the Debtor. Rather than reject the current signage agreements, the Debtor could have renegotiated the current contracts and included the new provisions in the modified contracts. The Debtor could then have assumed the modified contracts. This Court finds that the Debtor's assumption of the modified contracts would likely achieve the same economic goals as that which underlies the Debtor's arbitrary classification

scheme, i.e., rejection of the current signage agreements, creation of Class 5, and the execution of the new agreements proposed in the Van Wagner and Spectacolor stipulations.

Mr. Nevid, also at trial, admitted that the Debtor made no attempt to renegotiate contract terms with Van Wagner and Spectacolor:

> The Court: Since you gave it to the signage people ... on a take it or leave it basis, could you not have reached this agreement without a rejection of the executory contracts?
>
> Mr. Nevid: I was advised by—
>
> The Court: I know what you were advised you had the legal right to do, and I think everybody is in accord with that; but you also had the right, ... to agree to a modification of your agreement without a rejection of the existing contract.
>
> Mr. Nevid: Well, Your Honor, two things. Number one, we were advised ... that we can reject ...
>
> The Court: I have no problem with that.
>
> Mr. Nevid: Okay, but from a practical standpoint, as a layman not as an attorney, certainly not as a bankruptcy attorney, it didn't make sense to me. Renegotiation, per se, didn't seem like a possibility because we would be renegotiating in vain because we would end up—they would be foreclosed upon, we would be foreclosed upon, it wouldn't serve any purpose. We didn't have many alternatives, we had to reject—
>
> The Court: In order to put them in a separate class?
>
> Mr. Nevid: (Continuing)—to make the plan feasible.
>
> . . .
>
> The Court: My question is, could you have reached that agreement to modify the original agreement without rejecting the previous agreement?
>
> Mr. Nevid: It was never considered. I don't know if we could have.
>
> The Court: Why wasn't it considered?

> Mr. Nevid: It was explained to me by counsel that the contracts, they were rejectable and they had to be rejected, period. Those are my marching orders.

*Hrg. Tr.* at 407 1. 1.4—410 1. 1.8.

Since creation of Class 5 serves no legitimate purpose in the financial restructuring of the Debtor, this Court finds that the purpose of creating Class 5 was solely to create a separate, non-insider, impaired class guaranteed to accept the Plan. The lease rejection claimants and all other unsecured claimants have the same legal relationship with the Debtor, that of general unsecured creditors. The legal nature of the rejection claims are not unique and separate classification is not justified by any sound business reason. Therefore, this Court finds that the Debtor's Plan of Reorganization violates sections 1122(a) and 1129(a)(1) of the Code.

### 2) *CRAM DOWN AND THE TREATMENT OF THE BANK'S SECURED CLAIM UNDER THE PLAN*

Assuming, arguendo, this Court were to find the classification scheme proposed in the Plan permissible, then it would be necessary for this Court to address the other objections raised by the Bank. The Bank's second objection is that the Plan fails to provide the Bank with "fair and equitable" treatment with respect to its secured claim, because the Plan does not provide the Bank with a present value on its secured claim, equal to or greater than the $19,000,000 stipulated value. Thus, the Bank argues that the Plan violates section 1129(b)(2)(A)(i)(II) of the Code.

Confirmation of a plan of reorganization requires that the plan be accepted by all impaired classes of claims. *See* 11 U.S.C. § 1129(a)(8) (1991). When an impaired class rejects the plan, the court may nevertheless confirm over the objection of impaired classes provided three criteria are met: (1) the plan does not discriminate unfairly, (2) the plan is fair and equitable with respect to each impaired class of claims and (3) the thirteen conditions precedent to confirmation contained in section

1129(a) are satisfied. 11 U.S.C. § 1129(b)(1) (1991).

The Bank has voted both its Class 4 and Class 6 impaired claims to reject the Plan. Therefore, the Plan cannot be confirmed unless the Debtor can demonstrate that the Plan does not violate the cram down provisions of section 1129(b).

To satisfy the "fair and equitable" requirement with respect to a secured claim, the claimholder: (1) retains its lien; and (2) receives "deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property." 11 U.S.C. § 1129(b)(2)(A)(i)(I)–(II) (1991); *In re Bryson*, 961 F.2d at 500. The facts of this case do not require an analysis of the first issue. Applying the second requirement, the secured creditor must retain its liens on the property and the deferred payments must be discounted at an interest rate which is sufficient to compensate the creditor for the time value of money. *In re Bryson*, 961 F.2d at 500.

Although the Code does not expressly provide how interest rates should be computed, this Court agrees with the courts that follow the rule articulated in *Collier*. Accordingly, we hold that the proper interest rate is the current market rate for loans which are similar in term, quality of security, and risk of repayment or financial condition of the borrower. 5 *Collier on Bankruptcy*, ¶ 1129.03[f][i]; see, *In re Bryson*, 961 F.2d at 500; *In re Monnier Bros.*, 755 F.2d 1336, 1339 (8th Cir.1985).

The Bank argues, and this Court agrees, that the interest rates contemplated by the Plan do not reasonably reflect the potential risks to be borne by the Bank. Based upon the evidence adduced at trial, the Debtor cannot obtain a loan for a 100% loan-to-value ratio under the terms it is proposing under the Plan. Simply put, a comparable loan is not available in the market place.

Because the interest rates the Debtor proposes do not approach the range of prevailing market rates for loans of comparable risk and duration, the payments to the Bank will not yield a present value of $19 million. Thus, the Debtor has failed to propose a Plan which is "fair and equitable" to the Bank and, therefore, the Debtor's Plan violates section 1129(b)(2)(A)(i)(II) of the Code.

### 3) *SECTION 1129(b)(2)(B)(ii)—THE ABSOLUTE PRIORITY RULE AND THE "NEW VALUE" EXCEPTION*

The Bank argues that the Plan violates the absolute priority rule because the holders of Class 8 interests, the Debtor's limited partners, will retain their interests, without dilution of their pre-petition equity shares, while the Class 6 unsecured creditors will be paid only 7½% of their allowed secured claims, over five (5) years, without interest.

The Bank further contends that the "new value" exception to the absolute priority rule does not exist, and that even if it did exist, the interests retained by interest holders are limited to the extent of the "new value" actually provided to the reorganized Debtor. If the new value exception does exist, so argues the Bank, the interest retained is limited by the fair market value of the equity in the reorganized Debtor, as measured by the amount that creditors or third parties are willing to pay to obtain an equity interest in the reorganized Debtor and subject to higher and better offers.

The new value exception was first announced in *Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939) (*Los Angeles Lumber*). In *Los Angeles Lumber* the Supreme Court, citing *Northern Pacific Railway Co. v. Boyd*, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931 (1913), and *Kansas City Terminal Railway Co. v. Central Union Trust Co.*, 271 U.S. 445, 46 S.Ct. 549, 70 L.Ed. 1028 (1926), said that where the need for new money essential to the success of the reorganized debtor arises and the old equity holders make a fresh contribution and receive in return a participation "reasonably equivalent to their contribution" no

objection can be made. 308 U.S. at 121, 60 S.Ct. at 10.

 Although neither the Supreme Court, nor the Second Circuit, has specifically ruled upon the issue of the continued existence of the new value exception, the Supreme Court has referred to it. In *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988) (*Ahlers*), the Court indicated that there would be no expansion of the new value exception beyond that recognized in the case law at the time the Code was enacted. *Id.*, 485 U.S. at 205, 108 S.Ct. at 968. In footnote 3, however, the Court specifically stated that it was not ruling on the continued existence of the new value exception[15]. Thus, there has been disagreement as to whether the new value exception has survived the enactment of the Code.

Recently, the Ninth Circuit in *Bonner Mall Partnership v. U.S. Bancorp Mortgage Co.*, 2 F.3d 899 (9th Cir.1993) (*In re Bonner Mall Partnership*) held that "the new value exception remains a vital principle of bankruptcy law." In *In re Bonner Mall Partnership*, the debtor, owner of a shopping mall in foreclosure, proposed a Chapter 11 plan of reorganization that relied on the new value exception. U.S. Bancorp Mortgage Co. objected to the plan, arguing, *inter alia*, that the new value exception had not survived the enactment of the Code.

 The Ninth Circuit's opinion on the continued viability of the new value exception hinges on its interpretation of the absolute priority rule. The absolute priority rule was a judge-made doctrine under the Bankruptcy Act (the "Act") and is now codified pursuant to section 1129(b)(2)(B)(i) and (ii) in the Code. Pursuant to section 1129(b)(2)(B)(ii), "The holder of any claim or interest that is junior to the claims of [a senior] class will not receive or retain under the plan on account of such junior claim or interest any property." (emphasis added) 11 U.S.C. § 1129(b)(2)(B)(ii). "Had Con-

gress intended that old equity never receive any property under a reorganization plan where senior claim classes are not paid in full, it could simply have omitted the 'on account of' language from section 1129(b)(2)(B)(ii)." *In re Bonner Mall Partnership*, 2 F.3d at 909. A plan of reorganization that allows old equity to retain property "on account of" a substantial, necessary, and fair new value contribution, does not give old equity property "on account of" prior interests. *In re U.S. Truck*, 800 F.2d at 581.

Section 1129(b)(2)(B)(ii) prohibits old equity holders from retaining property on account of their claims or interests if classes of creditors senior to them have not been paid pursuant to section 1129(b)(2)(B)(i). However, Section 1129(b)(2)(B)(ii) does not say that old equity holders may never retain property.

In *Dewsnup v. Timm*, —— U.S. ——, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992), the Supreme Court's most recent decision concerning interpretation of the Code in light of the Act, the Court held that when amending the bankruptcy laws "[Congress did] not write 'on a clean slate.' " Therefore, most bankruptcy analysts look to pre-Code practice under the Act for the most logical referral of the exception to section 1129(b)(2)(B)(ii). Since the new value exception was a recognized exception to the absolute priority rule under the Act, and section 1129(b)(2)(B)(ii) does not completely forbid old equity from retaining property, this Court finds that the new value exception has, indeed, survived enactment of the Code.

 In consideration of above findings, it therefore follows that the Debtor's new value contribution must be evaluated in light of the criteria announced in *Los Angeles Lumber*. For old equity to retain its interests pursuant to the exception, the capital contribution must be (1) new, (2) substantial, (3) money or money's worth, (4) necessary for a successful reorganization and (5) reasonably equivalent to the

---

**15.** "[O]ur decision today should not be taken as any comment on the continuing vitality of the *Los Angeles Lumber* [new value] exception ...." *Ahlers*, 485 U.S. at 203, 108 S.Ct. at 969, n. 3.

value or interest received. (Citations omitted.) *In re Bonner Mall Partnership*, 2 F.3d at 908.

■ The instant case is analogous to *In re Miami Center Associates, Ltd.*, a recently reported single asset real estate Chapter 11 case. *In re Miami Center Associates, Ltd.*, 144 B.R. 937 (Bankr. S.D.Fla.1992). *In re Miami Center Associates, Ltd.*, concerns circumstances in which the debtor's partners were to contribute new value in the amount of $2 million dollars upon confirmation of the Plan. *Id.* at 942. In return, the partners would retain an interest in the debtor's property with a present value of $18,550,000. The secured creditor was owed approximately $38 million dollars in connection with first and second nonrecourse mortgages that it held on both the Debtors real and personal property. Under the Plan, unsecured creditors were not to be paid in full. The court held that it was the partners who primarily stood to gain from the capital cash infusion, while the secured creditor ran the ultimate risk of the project's failure with no upside potential. The court, without ruling on the continued viability of the new value exception, held that the treatment of the secured creditor was not fair and equitable because the size of the new value contribution was not reasonably equivalent to the equity retained. *Id.* Thus, the plan violated the absolute priority rule.

Similarly, in the instant case the Debtor's principals are proposing a new value capital infusion in the approximate amount of $2.4 million, $770,000 of which will be contributed by Van Wagner. At confirmation, the proposed contribution is $1,590,000, of which $240,000 is to be contributed by Van Wagner.

It appears that only a small portion of the "new value" capital infusion is allocated to satisfy creditors' claims upon confirmation. The new value is to be used primarily to make repairs to OTS and thereby preserve and enhance the value of the interest to be retained by the contributing principals[16]. Thus, the Plan reserves the upside potential for the Debtor while forcing the Bank to bear all the risk.

This Court finds that the proposed capital contribution of the limited partners is not proportionate to the interests which they will retain under the Debtor's Plan of Reorganization. We therefore conclude that the capital infusion fails to meet the requirements of the new value exception.

The Bank maintains that in order to promote the best interest of the creditors, the equity stake in the Debtor should be subject to higher and better offers including offers from the public or other creditors. In that way, creditors can be assured that they are receiving the maximum capital infusion available.

■ The Debtor responds by pointing out that the Bank possesses a total claim against the Debtor of approximately $30 million. OTS has a stipulated value of $19 million. Accordingly, the Plan provides that the Bank will retain its lien on OTS to the extent of $19 million. Thus, the Debtor has no equity in OTS by virtue of the Bank's post-confirmation mortgage on OTS for $19 million.

The Debtor's argument is a variation of the "no value" theory rejected by the Supreme Court in *Ahlers*. In *Ahlers*, the debtor argued that the absolute priority rule does not apply where the property which the junior interest holder wishes to retain has no value to the senior unsecured creditors. *Ahlers*, 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988). The debtor maintained that "the creditors are deprived of nothing if such a so-called 'interest' continues in the possession of the reorganized debtor." *Ahlers*, 485 U.S. at 207, 108 S.Ct. at 969. "Even where debts far exceed the current value of assets, a debtor who retains his equity interest in the enterprise retains 'property' ... Whether the value is 'present or prospective, for dividends or only for purposes of control' a retained equity interest is a property interest to 'which the creditors [are] entitled ... before the stockholders [can] retain it for any purpose whatever.'" *Ahlers*, 485 U.S. at

**16.** *Debtor's Plan of Reorganization* at 15.

208, 108 S.Ct. at 969, *citing, Northern Pacific R. Co. v. Boyd,* 228 U.S. at 508, 33 S.Ct. at 561.

In the instant case, the proposed new infusion of capital is not reasonably equivalent to the interests being received by the limited partners. Hence, the requirements for the new value exception to the absolute priority rule are not met. Therefore, the Plan violates section 1129(b)(2)(B)(ii) of the Code.

**4) *FEASIBILITY OF THE DEBTOR'S PLAN***

■ Section 1129(a)(11) of the Code requires that a plan be feasible in order for it to be confirmable, such that:

> confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

11 U.S.C. § 1129(a)(11).

*Collier* articulates a summary of the feasibility requirement:

> Basically, feasibility involves the question of emergence of the reorganized debtor in a solvent condition and with reasonable prospects of financial stability and success. It is not necessary that the success be guaranteed, but only that the plan present a workable scheme of reorganization and operation from which there may be a reasonable expectation of success.

5 *Collier on Bankruptcy* (15th ed. 1992) ¶ 1129.02[11], at 1129–54.

■ The feasibility test requires the court to determine whether a plan is workable and has a reasonable likelihood of success. *In re Drexel Burnham Lambert Group, Inc., et al.,* 138 B.R. 723 (Bankr. S.D.N.Y.1992). The purpose of the feasibility test has been described as protection against visionary or speculative plans. *Pizza of Hawaii, Inc. v. Shakey's, Inc. (In re Pizza of Hawaii, Inc.),* 761 F.2d 1374, 1382 (9th Cir.1985) *quoting,* 5 *Collier on Bankruptcy* ¶ 1129.02[11] at 1129–34 (15th

ed. 1984); *accord, Drexel Burnham,* 138 B.R. at 762.

■ Factors a plan's proponent must address and that a court should consider in making a feasibility determination include: (1) the adequacy of the debtor's capital structure; (2) the earning power of the business; (3) the economic conditions; (4) the ability of management; (5) the probability of the continuation of the same management; (6) any other related matters which determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan. *In re Landmark Plaza Park, Ltd.,* 7 B.R. 653, 659 (Bankr.D.N.J.1980); *In re Toy & Sports Warehouse, Inc.,* 37 B.R. 141, 151 (Bankr.S.D.N.Y.1984).

Based on the testimony of Robert Von Ancken ("Von Ancken"), President of James Felt Appraisal and Consulting Services, and the supporting documents presented, this Court rejects the Bank's argument that the projections of earning power for OTS are overly optimistic without a change in the current management. We further find that, absent the other statutory infirmities which this Court has already found bar the confirmation of this Plan, were the Plan to be confirmed, a change in management would not be necessary.

The success of the Plan is based largely on the potential income from the projected new signage on the south, east, and west facades of OTS. While it is difficult to precisely predict the future income from the building's signage generally, the Plan, nevertheless, proposes a plausible strategy for leasing new signage on the facades of OTS. In addition, at trial, Von Ancken made assumptions which revealed that the building's earning power is likely to improve over the life of the Plan. Because, this Court is persuaded that the Plan presents reasonable prospects of the Debtor's future financial stability we find that the Plan as proposed is feasible and comports with section 1129(a)(11) of the Code.

**Conclusion**

For the preceding reasons, this Court finds that the Debtor's Plan of Reorganiza-

tion is not in compliance with the various sections of the Bankruptcy Code discussed above.

Therefore, this Court holds that the Plan proposed by the OTS Limited Partnership cannot be confirmed. Additionally, the Bank's motion for relief from the automatic stay pursuant to section 362(d) of the Code is granted. Accordingly, counsel for the Bank should settle an order on five (5) day's notice consistent with this opinion.