**In re WOODMERE INVESTORS LIMITED PARTNERSHIP,**
Debtor.

**Bankruptcy No. 92–B–46455(CB).**

United States Bankruptcy Court,
S.D. New York.

Feb. 3, 1995.

349

Cadwalader, Wickersham & Taft by Barry J. Dichter, James P. Seery, Jr., Susan Dicicco, New York City, for debtor.

Bachner, Tally, Polevoy & Misher by William J. Lowy, Ruth Berkowitz Bergwerk,

New York City, for Connecticut Mut. Life Ins.

### MEMORANDUM DECISION ON CONFIRMATION OF THE DEBTOR'S PLAN OF REORGANIZATION

CORNELIUS BLACKSHEAR, Bankruptcy Judge.

#### INTRODUCTION

The matter before this Court is the confirmation of the plan of reorganization, as amended, filed by Woodmere Investors Limited Partnership (the "Debtor"). As more fully explained below, Connecticut Mutual Insurance Company ("Connecticut Mutual"), the first mortgagee of the Debtor's single asset—an apartment complex, objects to confirmation of the Debtor's plan because it does not meet the requirements for confirmation pursuant to section 1129 of Title 11 of the United States Code (the "Bankruptcy Code").

Two additional issues inextricably related to the Debtor's confirmation of its plan, will also be decided by this Court—the Debtor's objection to Connecticut Mutual's claim and Connecticut Mutual's motion for summary judgment in an adversary proceeding filed by the Debtor.[1]

For the following reasons, the Debtor's plan cannot be confirmed.

#### BACKGROUND

The Debtor is a Michigan limited partnership formed on October 19, 1984. One of the two general partners is SVB Capital, Inc., a New York Corporation, which is wholly owned by Stephen Blumenthal. The other is Samson Capital Corporation, a Rhode Island Corporation, which is wholly owned by Earl Samson. In addition, the Debtor has approximately 33 limited partners.

The Debtor owns a 24 building, 268 unit garden apartment complex located in Grand Rapids, Michigan or commonly known as "Fox Meadow Apartments" (the "Property").[2] The Property is encumbered by Connecticut Mutual's first mortgage which secures an indebtedness of the Debtor of approximately $5.58 million.[3]

On or about December 14, 1987, the Debtor executed and delivered several loan documents (the "Loan Documents") to Connecticut Mutual, including a mortgage note (the "Note") in the original principal amount of $5,500,000, and a Mortgage and Security Agreement (the "Mortgage"). On the same day, the Mortgage was duly recorded. There are no other mortgages on the Property. The Debtor also executed and delivered to Connecticut Mutual an Assignment of Rents and Leases (the "Assignment of Rents") to further secure repayment of the Note. The Assignments of Rents was also duly recorded. The Note matured on December 1, 1992.

The Debtor defaulted under the terms of the Loan Documents, in part because it failed to pay principal and interest due from and after June 1, 1992, and real estate taxes for the Property for 1991 and 1992. Despite negotiations between Connecticut Mutual and the Debtor to reach an agreement, the parties remained at an impasse. Thereafter, Connecticut Mutual took steps to enforce the Assignment of Rents and to foreclose the Mortgage.

*Foreclosure Proceedings and Woodmere's Chapter 11 Filing*

On October 19, 1992, Connecticut Mutual filed a Statutory Notice of Default which was duly recorded (the "Notice of Default"). Connecticut Mutual subsequently served a copy of the Assignment of Rents and the Notice of Default on the tenants of the Property. In addition, Connecticut Mutual also served a notice on all tenants, directing them to make all subsequent rental payments to Connecticut Mutual's agent, Hartger & Willard Mortgage Associates, Inc. ("Hartger &

---

**1.** Adversary Proceeding No. 92–1246A.

**2.** There are 210 two bedroom units and 58 one bedroom units.

**3.** These figures are as of the April 8, 1993 hearing. *See* Transcript at 27. There is also a real estate tax lien in favor of the City of Grand Rapids set approximately at $175,000 which has priority over Connecticut Mutual's lien. Thus, the total liens on the property amounts to approximately $5.8 million.

Willard"). A disputed issue in this contested confirmation is whether Connecticut Mutual has sufficiently enforced the Assignment of Rents under Michigan law and thereby extinguished any interest of the Debtor in the rents generated by the Property (the "Rents") to the detriment of the Debtor's bankruptcy estate.

In November 1992, Connecticut Mutual began foreclosure proceedings against the Debtor by advertisement as provided by applicable Michigan Law, and sought the appointment of a receiver for the Property.

*The Bankruptcy Proceedings*

On or about November 19, 1992, five days before the Michigan State Court was to hear Connecticut Mutual's motion for appointment of a receiver, the Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code. In response, Connecticut Mutual filed its proof of claim for $5,571,-995.52 plus other post petition charges. The Debtor filed an objection to the amount of Connecticut Mutual's claim on or about April 8, 1993.

*Rents and Property of the Estate*

On or about December 19, 1992, the Debtor made an application pursuant to Section 364 of the Bankruptcy Code for authorization to use the Rents (the "Cash Collateral Motion"). Connecticut Mutual opposed the Cash Collateral Motion on several grounds, including the inability of the Debtor to use the Rents it claims are not property of the estate. In addition, Connecticut Mutual moved to transfer venue of the Debtor's Chapter 11 case to the United States Bankruptcy Court for the Western District of Michigan, the district in which the Property is located (the "Venue Motion"). The Debtor opposed the Venue Motion.

At a hearing before this Court on January 19, 1993, this Court resolved the Cash Collateral Motion and the Venue Motion.[4] The Court ordered the Debtor to file a plan and disclosure statement on or before February 3, 1993. In the event that the Debtor failed to file a plan and disclosure statement by that date, the Chapter 11 case would be transferred to the Michigan Bankruptcy Court.[5]

Connecticut Mutual and the Debtor entered into a stipulation which allows Connecticut Mutual to continue to collect the Rents through Hartger & Willard. In exchange, Connecticut Mutual would advance funds to the Debtor for payment of necessary operating expenses of the Property pursuant to an agreed budget from rents collected. Money in excess of the amounts necessary for operating expenses would be applied to reduce Connecticut Mutual's claim.[6] However, the parties are in disagreement as to the method of reducing the indebtedness owing to Connecticut Mutual; the Debtor asserts that the Rents should be applied to the secured portion of Connecticut Mutual's loan while Connecticut Mutual argues that it should be applied to the entire claim.

The valuation of the Property is another contested issue. Since 1987, the Debtor has made improvements to the Property valued at approximately $1,000,000.[7] Debtor contends that, except for during the renovation period, Fox Meadow has consistently maintained high occupancy rates. Debtor asserts that the value of the Property ranges from $5.4 to $5.5 million while Connecticut Mutual

---

4. The motions were resolved by essentially administering this case on the "fast-track".

5. In addition, in the event that the Debtor did not timely file a plan of reorganization, the automatic stay pursuant to Code Section 362 would be lifted in favor of Connecticut Mutual.

6. On March 10, 1993, an order was signed authorizing the Debtor to repay tenants their prepetition security deposits as they become due, and those that are past due, in the ordinary course of the Debtor's business.

7. The facades on the individual buildings have been repainted. All of the boilers have been rebuilt, insulation has been installed in the attics, and all common hallways have been re-carpeted. In addition, the Debtor has put an asphalt topping on the parking areas and a number of roofs have been replaced. 254 of the 268 apartment units have been completely remodeled and are equipped with new kitchen cabinets, refrigerators, stoves, dishwashers and disposals. In addition, ceiling fans were installed in both the bedroom and dining room areas of each unit. Also each unit has been re-carpeted, repainted and rewired with updated electrical outlets and switches.

argues that the value is $4.8 million. Despite their disagreements, the parties do not seriously dispute that Connecticut Mutual is an under-secured creditor because the City of Grand Rapid's tax claim, in the amount of $175,000, has priority over Connecticut Mutual's claim.

*The Debtor's Plans of Reorganization*

In compliance with this Court's order, on or about February 3, 1993, the Debtor filed a plan (the "Initial Plan") and a Disclosure Statement (the "Initial Disclosure Statement"). Following a hearing before this Court held on March 2, 1993, this Court directed that certain modifications be made to the Initial Disclosure Statement. On or about March 8, 1993, this Court entered an order approving the Debtor's amended Disclosure Statement pursuant to Section 1125 of the Bankruptcy Code (the "Amended Disclosure Statement"). Subsequently, the Debtor transmitted the Disclosure Statement along with the Debtor's First Amended Plan of Reorganization (the "First Amended Plan").[8] A hearing (the "Confirmation Hearing") to consider confirmation of the Debtor's First Amended Plan was scheduled for April 8, 1993. On or about April 19, 1993, the Debtor filed a modification of the First Amended Plan. On or about April 30, 1993, the Debtor again filed a second modification of the First Amended Plan (collectively, the First Amended Plan and all the modifications thereto are hereinafter the "Plan"). The following is a summary of the Plan:

CLASS 1 (Allowed Priority Claims): Class 1 consists of allowed priority claims. Such claims entitled to priority pursuant to section 507(a) of the Bankruptcy Code will be paid in full. Consequently, Class 1 is not impaired.

CLASS 2 (Allowed Convenience Claims): Class 2 consists of unsecured claims not exceeding $1,500, or which are voluntarily reduced to $1,500. Such claims will be paid in two equal installments, commencing on the first and second months after the effective date.[9] Class 2 is impaired.

CLASS 3: Class 3 consists of the secured real estate tax claims of the City of Grand Rapids which is fixed at $178,000, and is to be paid over five years at 7.5% per annum. Class 3 is impaired.

CLASS 4: Class 4 consists of Connecticut Mutual's secured claim to be paid over six years. To the extent of the value of the Property, Connecticut Mutual shall receive a new mortgage and non-recourse note with a maturity of nine years, accruing interest at 7.62% per annum (the "Modified Note")[10]. The principal of the Modified Note is to be amortized on a quarterly basis, *after payment* in full of the Class 6 claims. Such funds for amortization will be provided for by seventy-five percent (75%) of the Property's "Available Cash."[11] At maturity, the Modified Note is to be paid in full[12]. Class 4 is impaired.

CLASS 5: Class 5 consists of all allowed secured claims that are not in classes 3 and 4. The Debtor does not believe that there are any claimants in this class.

CLASS 6: Class 6 consists of unsecured claims including trade claims and the deficiency claim of Connecticut Mutual. Class 6 is impaired under the Plan. Such claims will accrue interest at the rate of 7.62%. Class 6 Claims shall be paid on a pro-rata basis from all available cash flow for 1993 and 1994 and subsequently seventy-five percent of Available Cash each calendar quarter until all Class 6 claims are paid in full.

CLASS 7: (Deferred Management Fee) Class 7 consists of the unsecured claims of

8. On or about March 10, 1993, Debtor filed a technical amendment to the First Amended Plan.

9. If there are any convenience claims amounting to $800 or less, such claims shall be paid in full in one payment.

10. The interest rate is calculated at 2.25% over the yield on U.S. Treasury Notes maturing in May 1999, as reported in the April 19, 1993, *Wall Street Journal*.

11. "Available Cash" is defined in the Plan as the total income in a given quarter less payments made in the ordinary course expense and certain required payments to claimants in Classes 1, 2, 3, 4 and 9.

12. The Plan contemplates that the "balloon payment" at maturity will be paid from the proceeds of the sale of the Property or the re-finance of the loan.

Synchron Management Company, the Debtor's managing Agent, for deferred managing fees of $62,960. The Claimants will be paid from twenty-five percent (25%) of the Available Cash. Class 7 claims will not be paid any interest on the claims. The Debtor reserves the right to make any payments due to the Class 7 claimants for the benefit of Class 6 claims. Class 7 is impaired under the Plan.

*CLASS 8:* (Limited Partner Loan Claims) Class 8 consists of the limited partner loan claims of $553,062, to be paid in full after Classes 4, 6, and 7 claims have been paid in full. Payment of Class 8 claims shall be fully subordinated to these classes. Such claims will accrue interest at 7.5% per annum but no interest shall accrue or be paid on unpaid interest. Class 8 is impaired under the Plan.

*CLASS 9:* (Security Deposit Claims) Class 9 consists of unimpaired claims of tenants for security deposits;

*CLASS 10:* (Subordinated Principal Amount Claim). Class 10 consists of the subordinate principal amount claims of Connecticut Mutual's claim, assuming the Debtor prevails in its adversary proceeding against Connecticut Mutual to equitably subordinate its claims. However, at a hearing held before this Court on December 8, 1993, this Court held in favor of Connecticut Mutual and dismissed that portion of Woodmere's complaint which sought to equitably subordinate Connecticut Mutual's claim for violation of the Fair Housing Act. Thus, there are no claims in this class.

*CLASS 11:* (Limited Partner Interests) Class 11 consists of the interest of the limited partners of the Debtor. Class 11 is unimpaired.

*CLASS 12:* (General Partner Interests) Class 12 consists of the interest of the General Partners of the Debtor.[13] Class 12 is unimpaired.

The impaired classes entitled to vote on the Plan are classes 2, 3, 4, 6, 7, and 8.[14] Classes 4 (Connecticut Mutual's secured claim) and 6 (Connecticut Mutual's unsecured claim and trade claims) voted to reject the Plan pursuant to Rule 3018(d) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules")[15]. Classes 2, 3, 7 and 8 have voted in favor of the Plan. Therefore, the Debtor is seeking confirmation of the Plan pursuant to section 1129(b)(1) of the Code or what is referred to in the vernacular as "cram down"[16].

### Connecticut Mutual's Objections

Connecticut Mutual's primary objections to the Plan are as follows: (1) the improper classification of the Plan violates sections 1122 and 1129 of the Bankruptcy Code; (2) the Plan violates section 1129(b)(2)(B)(ii) of the Bankruptcy Code because the classes to which Connecticut Mutual's claims belong are impaired while the classes containing the partnership interests in the Debtor are unimpaired—*i.e.*, the limited and general partners retain their equity interests in the Debtor; (3) the Plan calls for unfair treatment in violation of section 1129(b)(2)(A)(i)(II) of the Bankruptcy Code; and (4) the Plan is not feasible as required in section 1129(a)(ii) of the Bankruptcy Code.

### The Summary Judgment Motion

On or about December 28, 1992, Woodmere commenced an adversary proceeding

---

**13.** In addition, the Plan provides for the payment of administrative expenses including attorney's fees. The Debtor estimates that administrative expenses in excess of pre-petition retainers will $75,000.

**14.** *As noted earlier, Classes 5, 9, 11, and 12 are not impaired under the Plan.*

**15.** Rule 3018(d) of the Federal Rules of Bankruptcy Procedure provides that:
[a] creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim shall be entitled to accept or reject a plan in both capacities.

**16.** *Section 1129(b)(1) of the Code provides in* relevant part that:

... [i]f all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

against Connecticut Mutual seeking to: (1) subordinate a portion of its claim because of the Connecticut Mutual's alleged violation of the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* (the "Housing Act") and (2) determine whether the Rents constitute property of the Debtor's estate. On or about November 23, 1993, Connecticut Mutual moved for summary judgment (the "Summary Judgment Motion") pursuant to Bankruptcy Rule 7056.

On or about December 8, 1993, this Court held a hearing to consider the Summary Judgment Motion. At the hearing, this Court ruled in favor of Connecticut Mutual and denied the Debtor's request for equitable subordination of Connecticut Mutual's claim. However, as to the issue concerning whether the Rents constitute cash collateral, this Court found that it was inextricably tied to confirmation of the plan. Accordingly, this Court took this issue under advisement and will address this issue in conjunction with confirmation of the Plan.

## DISCUSSION

### I. THE DEBTOR'S OBJECTION TO THE AMOUNT OF CONNECTICUT MUTUAL'S CLAIM

This Court will first determine the total amount of Connecticut Mutual's claim. Connecticut Mutual had filed a proof of claim in the amount of approximately $5,571,995 and in addition asserts a claim for post-petition fees and charges. Debtor contests the portion of the claim which consists of anything other than principal and pre-petition interest.

The Proof of Claim filed by Connecticut Mutual asserts the following amounts: $5,222,699.36 in outstanding principal; accrued interest of $284,671.68; $9,192.88 for pre-petition attorney's fees; default interest in the amount of $18,549.13; and $36,882.47 for late charges.

The Debtor cites Section 506(b) of the Bankruptcy Code which authorizes any reasonable fees, costs, or charges to be included to a claim that is over-secured. The Debtor

argues that since Connecticut Mutual is not an over-secured creditor, it cannot make a claim for such costs and fees.[17]

In challenging a claim, the opponent bears the burden of proof. A proof of claim when filed is prima facie evidence of such claim. *See,* Bankruptcy Rule 3001(f). 8 King, *Colliers on Bankruptcy* ¶ 3007.03 at 3007–4—3007–5 (15th Ed.1994). Thus, the Debtor bears the burden of proof that Connecticut Mutual's claim should be disallowed.

### A. *Pre–Petition Attorney Fees*

Section 502(b) of the Bankruptcy Code provides that the claim of the creditor is to be determined as of the date of the filing of the petition. According to Paragraph 9 of the Note, Connecticut Mutual is entitled to "reasonable attorneys' fees" if the Note is "placed in the hands of an attorney for collection, ... to enforce its collection ... or to protect the security for its payment." Courts have awarded pre-petition attorney fees and collection costs in bankruptcy claims if the unsecured or undersecured creditors claimants has a right to them, which right is valid under state law. *See, e.g., In re Drexel Burnham Lambert Group, Inc.,* 148 B.R. 979, 980 (Bankr.S.D.N.Y.1992) (contractual claim for pre-petition attorney's fees allowed).

The Debtor does not contest the validity of these pre-petition fees and costs under state law. According to Paragraph 9 of the Note, Connecticut Mutual is entitled to "reasonable attorneys' fees" if the Note is "placed in the hands of an attorney for collection, ... to enforce its collection ... or to protect the security for its payment."

The Debtor instead argues that the amount claimed by Connecticut Mutual is unreasonable and thus, should be disallowed. However, it is the Debtor which bears the burden of proof. Here, the Debtor merely asserts that Connecticut Mutual failed to provide justification for its fees. Based upon

---

17. Section 506(b) states in relevant part:
 [t]o the extent that an allowed secured claim is secured by property the value of which ... is greater than the amount of such claim, there shall be allowed to the holder of such claim interest on such claim, and any reasonable fees, costs or charges provided for under the agreement under which such claim arose.
 11 U.S.C. § 506(b).

the evidence submitted, this Court finds that the Debtor has not met this burden. In the absence of persuasive evidence, this Court finds that the legal fees charged by Connecticut Mutual to be reasonable. Therefore, the Debtor's objection as to Connecticut Mutual's pre-petition attorney fees of $9,192.88 is overruled.

## B. *Default Interest and Late Charges*

■ By the same token, the Debtor does not dispute that a contractual provision providing for an increased interest rate upon default is unenforceable under Michigan law. The Debtor merely asserts that the default interest charged is an unenforceable penalty. However, when two sophisticated parties enter into a contract calling for an established rate on default, this Court will not disturb the agreement absent persuasive evidence of overreaching. *Cruise v. Castleton, Inc.*, 449 F.Supp. 564, 567–68 (S.D.N.Y.1978). Since no such evidence was presented, the default interest charged pre-petition is allowed.

■ Connecticut Mutual is also entitled to late charges pursuant to paragraph 8 of the Note. Paragraph 8 states, in relevant part, that:

[t]he undersigned agrees to pay a late charge of five percent (5%) of any installments of interest and/or principal or any portion thereof which are accepted by Obligee and are not paid within five (5) days after the same shall become due and payable under this Note, to *cover the extra expense involved in handling delinquent payments* (emphasis added).

As a matter of contract law, the Debtor argues that pursuant to the plain language of paragraph 8 of the Note, *no late charges are due* because no payments were made. Consequently, Connecticut Mutual incurred no expense in handling delinquent installments. This Court agrees. *Timberline Property Development*, 136 B.R. 382, 386 (Bankr.D.N.J. 1992), is a persuasive case wherein the court interpreted a similar provision and concluded that late charges should be disallowed when no payments were made at all because there should be no expense involved in handling the delinquent payments. Similarly, a plain reading of the paragraph indicates that the

purpose of the late charge was to compensate Connecticut Mutual for the extra expense in handling delinquent payments. Since the Debtor failed to make any payments to Connecticut Mutual, additional expenses in handling delinquent payments do not exist. Thus, the $36,882.47 claimed as late charges is disallowed.

## C. *Post–Petition Interest and Fees*

■ The Debtor also challenges Connecticut Mutual's claim for post-petition interest. Case law and section 506(b) of the Bankruptcy Code make it clear that post-petition interest is not permitted unless Connecticut Mutual is an over-secured creditor. *See, United Savings Association v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988); 3 King, *Colliers on Bankruptcy* ¶ 506–05 (15 Ed.1994). Since Connecticut Mutual is not an over-secured creditor, it is not entitled to post-petition interest.

■ The Debtor also objects to Connecticut Mutual's claim for post-petition attorney fees and costs. In support of its position, Connecticut Mutual cites *In re United Merchants & Manufacturers, Inc.*, 674 F.2d 134 (2d Cir.1982) and *In re Ladycliff College*, 56 B.R. 765 (S.D.N.Y.1985) for the proposition that an under-secured creditor is entitled to post-petition attorney fees and costs.

This Court notes that the ruling in *United Merchants* was made pursuant to Section 63 of the Bankruptcy Act. The Second Circuit in *United Merchants* expressly noted that section 506(b) was inapplicable. *United Merchants*, 674 F.2d at 138, Fn. 6. In dicta, the Second Circuit concluded that the Bankruptcy Code and legislative history do not shed any light on the status of an under-secured creditor's contractual claims for attorney's fees. *In re United Merchants*, 674 F.2d at 138. In reliance on *United Merchants*, other courts have held post-Code that an under-secured creditor is allowed to include post-petition attorney fees as part of the claim. *E.g., In re Ladycliff College*, 56 B.R. 765 (S.D.N.Y.1985); *Liberty Nat'l Bank v. George*, 70 B.R. 312 (W.D.Kentucky 1987).

Other courts, in applying the doctrine of *espresso unius est exclusio alterius* (a maxim of statutory interpretation meaning that the expression of one thing is the exclusion of another), have concluded to the contrary. *See, e.g., In re Sakowitz, Inc.,* 110 B.R. 268 (Bankr.S.D.Tex.1989); *In re Saunders,* 130 B.R. 208 (Bankr.W.D.Va.1991). According to the rationale, since Congress provided for attorney fees only for over-secured creditors, it did not mean to allow attorney fees for under-secured creditors. While this Court finds this statutory interpretation maxim and the rationale of the court in *Sakowitz* convincing, *United Savings Association v. Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) is a more convincing reason to prohibit the recovery of post-petition attorney fees.

In the *Timbers* case, the United States Supreme Court concluded that since section 506(b):

> permits post-petition interest to be paid only out of the 'security cushion,' the under-secured creditor, who has no such cushion, falls within the general rule disallowing post-petition interest.

*Id.* at 372–73, 108 S.Ct. at 631.

The same rationale is applicable to a claim for attorney fees and costs. If no "security cushion" exists to allow for post-petition interest, none exists for the allowance of attorney fees and costs. Section 506(b) does not distinguish between interest rates and attorney fees. In light of the *Timbers* holding, this Court does not feel compelled to follow the holding of *United Merchants* or *Ladycliff College,* both cases decided pre-*Timbers.* Accordingly, Connecticut Mutual, as an under-secured creditor, is not entitled to post-petition attorney fees.

---

**18.** Section 506(a) of the Bankruptcy Code states in relevant part:

An allowed claim of a creditor secured by a lien on property in which the estate has an interest, . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, . . . and is an unsecured claim to the extent that the value of such creditor's interest is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any

## II. *VALUATION OF THE PROPERTY*

 The determination of the value of the Property is necessary to establish the secured portion of Connecticut Mutual's claim pursuant to Section 506(a) of the Bankruptcy Code.[18] The Debtor claims that the value of the Property falls within the range of $5.4 to $5.5 million. This value is based primarily on the assessed value, as determined by Michigan statute. Mich. Comp. Laws Chapter 211 (1992). Connecticut Mutual disagrees and asserts a valuation of $4.8 million. In support of its position, Connecticut Mutual has presented expert testimony from the appraiser, David Rice, MAI, who performed an appraisal of the Property as of March 29, 1993 (the "Appraisal Report"). Based upon the evidence presented at trial and the papers submitted by the parties, this Court finds that the value of the Property is $5,100,000.

### A. *The Property*

As previously mentioned, the Property consists of a 24 building, 268 unit garden apartment complex constructed on a 18.7 acre site, located in the city of Grand Rapids. The Property was constructed in 1951 and renovated in the late 1980s. Vacancy rates have been low[19]. At the Confirmation Hearing, Connecticut Mutual's agent from Hartger & Willard testified that the Debtor's management was adequate and that his firm could not achieve much better results.

Despite the high occupancy rates, the apartment rental markets have been soft due to the construction of competing new apartments.

---

hearing on such disposition or use or on a plan affecting such creditor's interest.
11 U.S.C. § 506(a).

**19.** During the 53 months between January 1988 and May 1992, the occupancy rate fell just below 90%. However, during the period from 1988 through 1991, the Debtor maintains that the average occupancy rates for the Property remained between 93.6% and 96.7%. When Connecticut Mutual's appraiser inspected the Property on March 29, 1993, the Property had a 94% occupancy rate.

## B. *The Assessed Value and Connecticut Mutual's Internal Valuation*

 The Property has been valued by the city of Grand Rapids Assessor at $2.75 million [20], or one-half of the "Cash Value" as defined in Mich.Comp. Laws section 211.27 (1992).[21] The Debtor contends that under Michigan law, "cash value" is equivalent to market value and thus, the Property reflects a market value of $5.5 million.

The Debtor also draws this Court's attention to the fact that the assessed value had been recently reduced in 1992 after a successful appeal by the Debtor. The Debtor presented testimony that the 1992 assessed value of $5.5 million was not appealed in light of the perceived increase in property values. In support of its position, the Debtor also makes reference to Connecticut Mutual's own evaluation of the Property of $5.325 million in September 1992 as part of its portfolio evaluation process (the "September 1992 Report"). *See* Debtor's Exhibit 33. This internal valuation was performed by Hartger & Willard, independently assessed by Thomas Kelley—Connecticut Mutual's investment officer—and reviewed by Mr. Kelly's supervisor and Connecticut Mutual's Portfolio Review Committee.

 Courts have considered the assessed value of properties as probative in determining property values.[22] However, in light of other evidence before this court, this Court finds that the value of the Property to be lower than that assessed. Nor is this Court inclined to take the value derived in the September 1992 report as controlling. This Court is persuaded that the value derived in that report is also too optimistic as it was predicated upon an erroneous projections of financial statements.[23] Moreover, the fact that the Debtor had placed the Property on the market and failed to obtain an offer close to the assessed value is another indication that the value asserted by the Debtor is overly optimistic. On the other hand, this Court is also not persuaded that the $4.8 million value derived in the Appraisal Report is correct. For the reasons set forth below, the Court finds that the value derived in the Appraisal Report to be too low.

## C. *The Appraisal Report*

 As noted previously, the Appraisal Report valued the Property at $4.8 million. Mr. Rice, the appraiser, utilized two of the three typical appraisal approaches in the valuation of real estate. The values derived by utilizing the sales comparison approach and the income approach were $5.1 million and $4.7 million, respectively.

The sales comparison approach essentially entails the analysis and comparison of market transactions involving similar properties. The premise of this approach is that an informed purchaser would pay no more for the Property than the cost of acquiring a similar property with the same utility. The sales price of these comparable sales are then adjusted to minimize the differences of the comparable property, and eventually arrive at an indication of value for the subject property. The "effective gross income multiplier" is derived from market transactions and illustrates the relationship of property income to sale price.

This effective gross income multiplier was used by Mr. Rice in the Appraisal Report. This Court finds persuasive the Debtor's argument that the multiplier used should have been higher. At the hearing, Mr. Rice testified that he failed to consider the multiplier for one of the comparable sales—one that was sold two months prior with a higher multiplier and sold in a condition worse than Fox Meadows. If Mr. Rice had considered that multiplier, this Court is persuaded that the value derived by the market approach would have been higher.

The second approach used by Mr. Rice is the income approach which is based on the assumption that there is a relationship be-

---

20. The assessed value was derived pursuant to Mich.Comp. Law section 211.27a(1) (1992).

21. *See* Debtor's Exhibit 12.

22. *See, e.g., Frieders v. Commissioner of Internal Revenue*, 687 F.2d 224 (7th Cir.1982), *cert. denied*, 460 U.S. 1011, 103 S.Ct. 1251, 75 L.Ed.2d 480 (1983).

23. *See* Transcript at 744–745.

tween the amount of income a property will generate and its value. The anticipated annual net income [24] is discounted via a method called capitalization. Capitalization involves dividing the net income by a rate which weighs such factors as risk, time and interest on capital investment. There is some dispute as to whether the appropriate vacancy rate was utilized by the appraiser. *See* Tr. at 428, 460. This Court is persuaded that the net income utilized by Mr. Rice is somewhat understated, and consequently the value derived from the income approach should have been higher. For the foregoing reasons, this Court concludes that the Property is worth $5.1 million.

## III. *ASSIGNMENT OF RENTS AND PROPERTY OF THE ESTATE*

■ By Order of this Court dated April 9, 1993, Rents generated by the Property have been collected by Connecticut Mutual's agent Hartger & Willard. The Rents pay all expenses incurred in connection to the operation and maintenance of the Property and the remainder is ear-marked to reduce Connecticut Mutual's claim. However, both parties agreed to hold in abeyance the determination of the ownership of the Rents.

Whether the Rents constitute property of the estate not only bears directly upon the feasibility of the Plan, as will be discussed later, but also upon the amount of Connecticut Mutual's claim. Thus, it is appropriate to address this issue at this juncture.

■ Questions concerning the validity and enforceability of assignments of rents and property rights in rents must be decided by reference to applicable state law. *Butner v. U.S.*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); *In re Vienna Park Properties*, 112 B.R. 597 (S.D.N.Y.1990), *aff'd* 976 F.2d 106 (2d Cir.1992). Thus, Michigan law, the law of the state in which the property is located controls. Predictably, both parties disagree as to the interpretation of Michigan law.

The controlling provisions of Michigan law regarding assignments of rents and enforcement thereof are set forth in Mich.Comp.

Laws Ann. sections 554.231 and 554.232 which provide, in part, as follows:

554.231 Assignment of rents to accrue from leases as additional mortgage security.

Sec. 1. Hereafter, in or in connection with any mortgage on commercial or industrial property other than an apartment with less than 6 apartments or any family residence to secure notes, bonds or other fixed obligations, it shall be lawful to assign the rents, or any portion thereof, under any oral or written leases upon the mortgaged property to the mortgagee, as security in addition to the property described in such mortgage. Such assignment of rents shall be binding upon such assignor only in the event of default in the terms and conditions of said mortgage, and shall operate against and be binding upon the occupiers of the premises from the date of filing by the mortgagee in the office of the register of deeds for the county in which the property is located of a notice of default in the terms and conditions of the mortgage and service of a copy of such notice upon the occupiers of the mortgaged premises.

554.232 Assignment of rents; validity.

Sec. 2. The assignment of rents, when so made, shall be a good and valid assignment of the rents under any lease or leases in existence or coming into existence during the period the mortgage is in effect, against the mortgagor or mortgagors or those claiming under or through them from the date of the recording of such mortgage, and shall be binding on the tenant under the lease or leases upon service of a copy of the instrument under which the assignment is made, together with notice of default as required by section 1.

Mich. Comp. Laws Ann. Sections 554.231 and 554.232 (West 1988).

■ As set forth in the Michigan statute, complete enforcement of an assignment of rents occurs when five steps have been taken by the mortgagee: (1) execution of the assignment of rents; (2) recording of the assignment of rents; (3) default under the Mortgage; (4) recording of notice of default;

---

**24.** Net income is defined as income prior to debt services, interest or depreciation.

and (5) service of the recorded notice of default and the instrument creating the assignment of rents upon the tenants. *In re Mount Pleasant Ltd. Partnership*, 144 B.R. 727 (Bankr.W.D.Mich.1992). There is no dispute that Connecticut Mutual has taken all the necessary steps to enforce its assignment of rents.

The Debtor argues that despite the fact that Connecticut Mutual took all the requisite steps to enforce its assignment of rents, the Rents remain property of the estate. Consequently, Connecticut Mutual only retains a security interest in the Rents. The Debtor relies primarily upon *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983), for its proposition. The Debtor alludes to its equitable interest in the Rents and argues that *Whiting Pools* applies.

Connecticut Mutual instead relies upon *In re Mount Pleasant Ltd. Partnership*, 144 B.R. 727, 734 (Bankr.W.D.Mich.1992), for the proposition that under Michigan law, once a creditor has taken the requisite steps to enforce the assignment of rents, ownership of the Rents is transferred from the mortgagor to mortgagee. This Court agrees with Connecticut Mutual's interpretation of Michigan law for the following reasons.

■■■■■ Michigan law allows a mortgagee to exercise its entitlement to collect rents without requiring the mortgagee to first take possession of the mortgaged premises or that a receiver be appointed. *Security Trust Co. v. Sloman*, 252 Mich. 266, 233 N.W. 216 (1930). An assignment of rents is "not merely an incident to the right of the possession of land, but is a distinct remedy and additional security." *Id.* at 273, 233 N.W. 216.[25] The right of the mortgagee to collect rents ceases at the expiration of the period of redemption if the premises are not redeemed. *Id.* at 274, 233 N.W. 216. However, the mortgagor's right of redemption is an interest in the future rents and not an interest in the pres-

ent rents when the Mortgage is in default. *In re Mount Pleasant*, 144 B.R. at 737. Thus, the mortgagor no longer has any interest in the present rents once a default has occurred. *Otis Elevator Co. v. Mid–America Realty Investors*, 206 Mich.App. 710, 522 N.W.2d 732 (1994) (creditor could not garnish mortgagor's interest in rents after mortgagor defaulted under the terms of its mortgage).

*Otis Elevator*, a case recently decided by the Court of Appeals of Michigan, cited with approval two federal bankruptcy court cases, *In re Mount Pleasant Ltd. Partnership*, 144 B.R. 727, 733–34 (Bankr.W.D.Mich.1992), and *In re Coventry Commons Associates*, 143 B.R. 837, 838 (E.D.Mich.1992), which cases interpreted Michigan law for this very issue—ownership of rents in a single asset case. *Id.* 206 Mich.App. at 713–14, 522 N.W.2d 732.

In *Coventry Commons*, the mortgagee recorded the assignment of rents but failed to record a notice of default and did not send copies of such notice to the tenants. *In re Coventry Commons*, 143 B.R. at 838. The district court held that the mortgagee had a perfected security interest and, as such, the rents constituted cash collateral. *Id.* at 839. In a situation more analogous to the present case, the court in *Mount Pleasant* held that once a mortgagee completed all the necessary five-steps for complete enforcement, the debtor lost any interest in the rents under state law. *In re Mount Pleasant Ltd., Partnership*, 144 B.R. at 737.[26] Similarly, since Connecticut Mutual had taken all the necessary steps for complete enforcement of its Assignment of Rents, the Debtor has lost its interest in the Rents.

This Court remains unconvinced that *Whiting Pools* mandates a different outcome. The debtor in *Mount Pleasant* also unsuccessfully made the same argument. *Id.* This court is persuaded that *Whiting Pools* is inapplicable because the Debtor no longer has any interest in the Rents. *Whiting*

---

**25.** The rents collected shall be applied to the debt. *Id.* 252 Mich. at 273, 233 N.W. 216.

**26.** *Mount Pleasant* actually involved two cases: *Mount Pleasant* and *Grand Traverse Resort*. Because the cases involved the same issue, the court consolidated those two matters. The *Mount Pleasant* mortgagee had failed to take all the steps necessary to enforce its assignment of rents while the mortgagee in *Grand Traverse* did take all the requisite steps. *Id.* at 729–31.

*Pools* only applies when ownership of the seized property has not been transferred. *Whiting Pools,* 462 U.S. 198, 209, 103 S.Ct. 2309, 2316 ("of course, if a tax levy or seizure transfers ... ownership of the property seized, section 542(a) may not apply.... But those provisions do not transfer ownership of the property....").

 Michigan law transfers ownership of the Rents to the mortgagee until the Mortgage is satisfied. The equitable interest the Debtor alludes to as property of the estate was correctly characterized by the *Mount Pleasant* court as an equitable interest in *future* rents and not in the *present* rents. *In re Mount Pleasant Ltd. Partnership,* 144 B.R. at 737. Under Michigan law, the interest revests if the mortgagor redeems the Mortgage.[27] However, all rents collected by the mortgagee from the time of default to the time of redemption belongs to the mortgagee until the Debtor redeems the Property. Until that time, the Rents belong to Connecticut Mutual. *Id.*

A bankruptcy court in the Eastern District of Michigan recently ruled that the rents in a single asset case constituted cash collateral even though the mortgagee had complied with all the necessary requirements to enforce its assignment of rents. *See In re Newberry Square, Inc.,* 175 B.R. 910 (Banker.E.D.Mich.1994). The court decided that the *Otis Elevator Company* case was not controlling as it merely determined the "relative priority rights of two creditors of the mortgagee." *Id.* at 914. However, with all due respect to the *Newberry Square* court, this Court disagrees. While it is true that the ultimate issue decided by the Michigan Court of Appeals was the relative rights of two creditors, the court clearly determined that the judgment creditor could not garnish the mortgagor's interest in rents because the mortgagor *no longer had a valid property interest* (emphasis added). *Otis Elevator,* 206 Mich.App. 710, 715, 522 N.W.2d 732. The Michigan Court of Appeals determined the "relative" rights of the creditors based upon the property rights of the mortgagor. Moreover, the *Otis Elevator* court cited with approval the *Mount Pleasant* case. *Id.* at 714. Thus, this Court does not believe that the *Newberry Square* case requires a different outcome.

 The Debtor alternatively argues that the future rents should be used to fund its plan since the Plan will cure the default and that curing the default would be the equivalent of redemption. A review of Michigan law reveals that redemption is consistently defined as payment in full. *See, e.g.,* Mich. Comp. Laws section 600.5744(6) ("writ of restitution shall not issue if ... the amount as stated in the judgment, together with the taxed costs, is paid...."); Mich.Comp. Laws section 570.1121(6) ("[r]edemption from a foreclosure sale is complete upon payment of all sums set forth in the judgment of foreclosure, together with any sums due for the payment of taxes or insurance premiums...."). Thus, this Court declines to hold that "cramming" down a creditor pursuant to section 1129(b)(1) constitutes redemption for the purposes of Michigan law. To do so would be in contravention of *Butner;* no matter what state law provided, a mortgagee's entitlement to rents would be cut short by the mortgagor's bankruptcy filing and a plan of reorganization which gives the mortgagee much less than he is entitled to pursuant to state law.

Therefore, the Rents collected by Connecticut Mutual do not constitute property of the estate and cannot be used in the Debtor's reorganization.

 The Court notes that under Michigan law, these rents collected must go towards the upkeep of the Property and reduction of the indebtedness. There was an issue raised by the parties whether that the amount should be used to reduce the total indebtedness or only to reduce the secured portion. In light of its holding regarding the ownership of the rents, the court need not decide this issue in this case. However, in light of Michigan law, if this Court were to decide this issue, Rents collected should be offset against the total amount of the claim

---

27. That Connecticut Mutual is required by statute to use the rent to preserve its the Property does not, in this Court's opinion, bear upon the ownership of the rents.

and not solely against the secured portion of the loan.

■ Moreover, setting aside state law, Connecticut Mutual has bargained for and received a security interest in the Rents. This is a separate and distinct collateral from a mortgage on the Property itself and, as such, the value of each interest must be separately considered. *See e.g., In re Landing Associates,* 122 B.R. 288, 296 (Bankr. W.D.Tex.1990) ("an assignment of rents confers rights which have discrete value apart from the underlying deed of trust interest in the real property generating those rents"); *In re 499 W. Warren Street Assoc., Ltd. Partnership,* 142 B.R. 53, 56 (Bankr. N.D.N.Y.1992) ("A secured creditor holding both a mortgage securing a debt on a parcel of real property, and a perfected security interest in rents derived therefrom, holds two distinct interests.... The value of each of those interests must be separately considered....").

■ Even assuming *arguendo* that the Rents were property of the estate, the Rents received constitutes additional collateral and, as such, these Rents increased Connecticut Mutual's allowed secured claim in equal amounts and by payment, decreased the secured portion of Connecticut Mutual's claim by that same amount. Thus, it would be inappropriate to solely offset the Rents against the secured portion of Connecticut Mutual's Claim.

## IV. *OBJECTIONS TO CONFIRMATION*

■ After concluding that the Rents are not property of the estate, this Court finds that the Plan fails to meet the requirements of section 1129(a)(11) of the Bankruptcy Code which requires that a plan be feasi-ble. The feasibility test as set forth in section 1129(a)(11) requires an independent determination as to whether the Plan is workable and has a reasonable likelihood of success.[28] *In re Drexel Burnham Lambert Group,* 138 B.R. 723, 762 (Bankr.S.D.N.Y. 1992); *In re 8315 Fourth Avenue Corp.,* 172 B.R. 725, 734 (Bankr.E.D.N.Y.1994). In light of the Debtor's inability to utilize the Rents for its plan and in the absence of alternative funding for the Plan, feasibility is a hurdle the Debtors are unable to overcome.

■ Assuming *arguendo* that the Rents were property of the estate, the Plan also cannot be confirmed because it cannot meet the requirements of "cram-down" pursuant to 11 U.S.C. § 1129(b)(1).[29]

As previously mentioned, Connecticut Mutual raises several other objections to the Plan which are as follows: (1) improper classification, in violation of sections 1122 and 1129(a)(1) of the Bankruptcy Code; (2) violation of the "absolute priority rule" as codified by section 1129(b)(2)(B)(ii) of the Bankruptcy Code; and (3) unfair treatment, in violation of section 1129(b)(2)(A)(i)(II) of the Bankruptcy Code. Of the above objections, this Court notes that improper classification pursuant to section 1129(a)(1) is a moot issue because an impaired, non-insider class, Class 3—consisting of the secured tax claim of the city of Grand Rapids—has accepted the Plan.

■ To satisfy the "fair and equitable requirement" with respect to a secured claim, the claimholder must: (1) retain its lien, and (2) receive "deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the Plan, of at least the value of such holder's interest in the estate's interest in such property." 11

**28.** Section 1129(a)(11) states that the court shall confirm a plan only if:

> [c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor of the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.
>
> 11 U.S.C. § 1129(a)(11).

**29.** Section 1129(b)(1) of the Bankruptcy Code provides:

> Notwithstanding section 510(a) of this title, if all the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.
>
> 11 U.S.C. § 1129(b)(1).

U.S.C. § 1129(b)(2)(A)(i)(I)–(II); *In re One Times Square Associates Ltd. Partnership,* 159 B.R. 695, 706 (Bankr.S.D.N.Y.1993) (citations omitted). Since the Plan calls for retention of Connecticut Mutual's lien, the pivotal issue in dispute is whether the Debtor has provided an interest rate so that the present value of the deferred payments would equal the value of Connecticut Mutual's interest. *See e.g., Id.*

■■■■ In an ideal setting, the appropriate interest rate would be the current market rate for loans which are similar in term, quality of security, and risk of repayment. *Id.* Here, the parties both agree that there is no market financing for a 100% loan-to-value, older apartment complex, with adequate cash flows. Thus, this court will use the "formula approach," or look to the prime interest rate or the interest rate on "risk-free" investments of similar duration and add an appropriate "risk-premium." *See, e.g., In re Briscoe Enterprises, Ltd. II,* 994 F.2d 1160, 1169 (5th Cir.1993) *cert. denied,* —— U.S. ——, 114 S.Ct. 550, 126 L.Ed.2d 451 (1993); *In re Eastland Partners Ltd. Partnership,* 149 B.R. 105 (Bankr.E.D.Mich. 1992).

■■■■ The Plan calls for Connecticut Mutual's secured claim in Class 4 to be paid over six (6) years at an interest rate of 7.62%. Said interest rate was derived by applying the six (6) year U.S. Treasury Note [30] plus a risk factor of 225 basis points to derive a percentage of 7.62%.

Both parties offered expert testimony as to the appropriate interest rate. The Debtor's expert witness, Conrad D. Stephenson, testified that a risk factor of 225 basis points was appropriate [31] while Connecticut Mutual's expert witness, Dennis Bernard,[32] testified that a risk factor of 450 to 500 basis points would be appropriate. For the following reasons, this Court finds that the appropriate risk premium is 350 basis points.

This Court is not persuaded that 225 basis points is sufficient as a risk factor because the evidence indicates that this premium was more appropriate for underwriting commercial property with a low loan-to-value ratio, a newer building and an adequate debt service coverage. In contrast, the Property in an older apartment building with a 100% loan-to-value ratio and a debt service coverage below the norm. Based upon the evidence, this Court is persuaded that 350 basis points would be the appropriate premium for this property. Thus, the Plan does not comply with the requirements of section 1129(b)(2)(A)(i)(II) of the Bankruptcy Code and cannot be confirmed.

■■■ Connecticut Mutual also asserts that the Plan violates the absolute priority rule as embodied in section 1129(b)(2)(B)(ii) of the Bankruptcy Code. For the reasons set forth below, this Court finds that the Plan violates the "absolute priority rule" as codified in 11 U.S.C. § 1129(b)(2)(B)(ii).

Section 1129(b)(2)(B) provides that the Debtor either pay Connecticut Mutual the allowed amount of its claim or that the Plan not violate the absolute priority rule. The Debtor purports to pay Connecticut Mutual, over time, the amount "equal to the allowed amount of such claim." However, based upon the actual performance of the Property, and the averaging of the Property's performance over the course of 1993 and 1994, the amount of administrative expenses in this case, this Court finds it unlikely that the amount is equal to the present value of Connecticut Mutual's claim.

Section 1129(b)(2)(B)(ii) provides that "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the Plan on account of such junior claim or interest any property." Class 6, which is impaired, consists of the unsecured claims of the trade claims and the deficiency claim of Connecticut Mutual. Connecticut Mutual objects to the Plan because it calls for the retention of the equity interest of both the limited partners and the general partners—in Classes 11 and 12, re-

---

**30.** The Treasury Note rate is the yield on U.S. Treasury Notes maturing in May 1999 as reported in the April 19, 1993 *Wall Street Journal. See* section 4.04 of the Plan.

**31.** Transcript at 123–125.

**32.** Transcript at 628.

spectively—while failing to provide the dissenting creditor the consideration to which it is entitled.

 While this Court has already recognized the existence of the "new value" exception to the absolute priority rule in *In re One Times Square*, 159 B.R. 695, 706 (Bankr.S.D.N.Y.1993); *aff'd* 165 B.R. 773 (S.D.N.Y.1994), this Court finds that the partners' contribution to the Plan fails to meet the requirements. In order to constitute "new value," the old equity holders must contribute capital that is new, substantial money or money's worth, necessary for a successful reorganization and reasonably equivalent to the value or interest received. *In re Bonner Mall*, 2 F.3d 899 (9th Cir.1993). Arguably, the Debtor's general partner could be contributing "sweat equity" as new value but it is settled law that sweat equity is not "money's worth". *See e.g., Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988); *In re Eitemiller*, 149 B.R. 626 (Bankr.D. Idaho 1993); *In re Custer*, 1993 WL 7965, 1993 Bankr. LEXIS 20 (Bankr.E.D.Pa. January 7, 1993). Assuming *arguendo* that the Rents from the Property could be construed as property of the estate, and that the Debtor's old equity could arguably claim that they were pledging the Rents as contribution, the Rents do not constitute "new value" for two reasons. First, it is settled law that a promise to pay future income is not "new value." *See e.g., In re 8315 Fourth Ave. Corp.*, 172 B.R. 725 (E.D.N.Y.1994); *In re Hendrix*, 131 B.R. 751 (Bankr.M.D.Fla.1991); *In re Boyd (Seattle Mortgage v. Boyd)*, 15. F.3d 1089, 1993 WL 533471 (9th Cir. Dec. 23, 1993). Second, rental income from the very asset the Debtor is attempting to keep over Connecticut Mutual's objection cannot be "new." *In re Boyd (Seattle Mortgage v. Boyd)*, 15 F.3d 1089, 1993 WL 533471 (9th Cir.1993). Thus, the Plan cannot satisfy all the requirements of the new value exception and cannot be confirmed pursuant to section 1129(b)(2).

## IV. *CONCLUSION*

1. The Rents belong to Connecticut Mutual and does not constitute property of the estate.

2. The Debtor's Plan cannot satisfy all the requirements of Section 1129(b)(1) and thus, cannot be confirmed.

CONNECTICUT MUTUAL IS TO SETTLE AN ORDER CONSISTENT WITH THIS OPINION ON FIVE (5) DAYS NOTICE.